**In re William H. FITZGERALD, Jr. and Valerie R. Phipps, Debtors.**

**Bankruptcy No. 92–54524–C.**

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

June 18, 1993.

Troy E. Cleveland, Rodriguez, Cleveland, Cannon & Buttles, San Antonio, TX, for debtor.

Marion A. Olson, Jr., San Antonio, TX, trustee.

William A. Frazell, San Antonio, TX, Asst. U.S. trustee.

### DECISION ON MOTION OF UNITED STATES TRUSTEE TO DISMISS FOR SUBSTANTIAL ABUSE

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the motion of the United States Trustee to dismiss this chapter 7 case for substantial abuse pursuant to 11 U.S.C. § 707(b). Upon consideration thereof, it is the ruling of the court that the motion should be granted.

### BACKGROUND FACTS

William Fitzgerald, Jr. and Valerie Phipps are a married couple who filed chapter 7 in October 1992. They have over 16 credit cards, on which they had run up charges of over $40,000. In addition, they owe Ms. Phipps' mother an additional $20,000 on a series of loans she made to the couple over the past four years.

Mr. Fitzgerald is a systems analyst at Kelly Air Force Base, while Ms. Phipps is a processing clerk for the Bexar County Sheriff. Their combined gross income is $4,841.00 per month. They have no children. Their income and expenses are such that (excluding a monthly $650 payment to Mrs. Phipps' mother, listed as an expense) they have approximately $950 a month available for debt repayment. They own a house against which they owe $53,000, have retirement plans worth over $30,000 and two autos worth $11,000.

The debtors were advised of the alternatives available to them when they consulted bankruptcy counsel, and elected to file chapter 7 primarily because they intended to continue to repay the debt owed to Mrs. Phipps' mother, via a reaffirmation. Had they filed under chapter 13, that debt would have received something less than fifty cents on the dollar over the life of the plan. In view of their continuing need for financial support from the elder Mrs. Phipps (which they avowed would not be forthcoming unless they continued to service the existing debt), they felt that chapter 7 was the more sensible alternative. In addition, the debtors were acutely aware of the financial straits recently imposed on the elder Mrs. Phipps by her recent divorce, and so felt a moral obligation to assure continued repayment of her debt to afford her a means of support.

The United States Trustee moved to dismiss the bankruptcy on grounds of substantial abuse, pursuant to section 707(b) of the Bankruptcy Code. 11 U.S.C. § 707(b).

The UST argued that the schedules and budget reflected a present ability to fund a chapter 13 plan that would yield a significant return to creditors. In addition, the debtors' efforts to prefer the elder Mrs. Phipps over the otherwise similarly situated claims of credit card creditors was evidence of bad faith, or at least of an attempt to use chapter 7 to prefer an insider creditor over arm's length creditors, in violation of the spirit of equitable distribution.

The debtor responded that the court should look to the totality of the circumstances and find that, because the debtors have not attempted to unfairly take advantage of their creditors, the case is not one reflecting a "substantial abuse" of chapter 7.

### ANALYSIS

■ This court has not previously addressed the standards for applying section 707(b), in part because it has not come up with any frequency in this district.[1] As a result, no one in this district has, to date, attempted to set down any guidelines. The Fifth Circuit has also not yet reached the issue (though other circuits have). We address it at this time to give direction to both the bar and the United States Trustee.

The parties rely on two different strands of case law in support of their respective positions. One line of cases adopts what many have described as a *per se* rule to the effect that, if a debtor can fund a chapter 13 plan, that finding alone will justify granting a motion to dismiss under section 707(b). *See In re Kelly*, 841 F.2d 908, 914–15 (9th Cir.1988); *In re Walton*, 866 F.2d 981, 983 (8th Cir.1989); *see also In re Gaukler*, 63 B.R. 224, 225 (Bankr.D.N.D. 1986); *In re Hudson*, 56 B.R. 415, 419 (Bankr.N.D.Ohio 1985); *In re Edwards*, 50 B.R. 933, 937 n. 3 (Bankr.S.D.N.Y.1985); 4 L. KING, COLLIER ON BANKRUPTCY, ¶ 707.07 (1987). The other eschews a bright line rule for a "totality of the circumstances" approach that leaves substantial discretion in the trial court, and that suggests evaluating a variety of factors such as the *bona fides* of the debtor and the nature of the pre-bankruptcy obligations sought to be discharged. *See In re Green*, 934 F.2d 568, 572 (4th Cir.1991); *In re Pilgrim*, 135 B.R. 314, 320–21 (C.D.Ill.1992).

In point of fact, the two lines of authority are not all that divergent. The progenitor of the *per se* rule is the Ninth Circuit's decision in *Kelly*, where the court said that

the debtor's ability to pay his debts when due as determined by his ability to fund a chapter 13 plan is the primary factor to be considered in determining whether granting relief would be substantial abuse.... We find this approach fully in keeping with Congress' intent in enacting section 707(b).... This is not to say that inability to pay will shield a debtor from section 707(b) dismissal where bad faith is otherwise shown. But a finding that a debtor is able to pay his debts, *standing alone*, supports a conclusion of substantial abuse.

*In re Kelly*, 841 F.2d 908, 914–15 (9th Cir.1988). The *Kelly* rule may thus more

---

1. Section 707(b) gives standing only to the United States Trustee and the court itself to raise the issue of substantial abuse. Congress was concerned that such a provision not be available to disgruntled creditors, who might be likely to abuse it. By limiting it to court officers with no "ulterior motive," Congress intended that its primary function of preserving the integrity of the system would be achieved. *See* S.REP. No. 65, 98th Cong., 1st Sess. 43 (1983); 130 CONG.REC. S7624–25 (June 19, 1984) (remarks of Senator Metzenbaum). Unfortunately, most panel trustees would never bring such motions anyway, as there is no economic incentive to do so, especially in no-asset cases where the trustee will only be paid $45.00 for handling the case. The cost of bringing the action is, in the usual case, not compensable unless the estate has assets.

Courts generally do not initiate such actions, in part because many judges shy from being thrust into the process as a "litigant," and in part because most judges never see the requisite facts that would trigger an inquiry (as they do not attend the section 341 meeting of creditors and usually do not see the schedules either). The United States Trustee is the logical entity to bring such actions, but they have commenced doing so in this district only recently, despite the fact that standing was conferred on the United States Trustee to bring such actions in the 1986 amendments. Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554, Title II, Subtitle A, § 219, 100 Stat. 3100 (Oct. 27, 1986).

properly be described not as a *per se* rule, but rather as a *rebuttable presumption* rule. The totality of the circumstances approach adopted by the Fourth Circuit in *Green* suggests some of the kinds of findings that might rebut the *Kelly* presumption. The *Green* court tallied factors such as

> (1) whether the petition was filed because of sudden illness, calamity, disability, or unemployment;
>
> (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay;
>
> (3) whether the debtor's proposed family budget is excessive or unreasonable;
>
> (4) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
>
> (5) whether the petition was filed in good faith.

*In re Green,* 934 F.2d 568, 572 (4th Cir. 1991).

The Eighth Circuit has come closest to actually articulating a "rebuttable presumption" approach in *U.S. Trustee v. Harris (In re Harris),* 960 F.2d 74, 77 (8th Cir.1992). Said that court, in interpreting its prior precedent, *In re Walton,*

> Although *Walton* stated that "the court may take the petitioner's good faith and unique hardships into consideration under section 707(b)," 866 F.2d at 983, that statement does not contemplate the sweeping and free ranging inquiry that the Fourth Circuit apparently required in *Green.* Indeed, we think that our narrower standard for determining "substantial abuse" in *Walton,* following the 9th Circuit *Kelly* decision, comports more with the Congressional purpose in § 707(b) than the 4th Circuit's broader standard in *Green.*

*Harris,* 960 F.2d at 77. In passing, the Eighth Circuit also rejected the suggestion that the standard should involve an inquiry into "egregious behavior" on the part of the debtor as the necessary prerequisite for dismissal under section 707(b). *Id.*

Section 707(b) itself states that

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request of suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b). The phraseology "substantial abuse" turns out to be an unfortunate choice of words on the part of Congress, given the clearly expressed intent of the statute set out in the legislative history. The words do seem to send a court looking for "egregious behavior," and the trial court in *Harris* can hardly be faulted for having gone down that road, given the Supreme Court's recent pronouncements on the importance of applying the "plain meaning" rule of statutory construction to interpretations of the Bankruptcy Code. *See, e.g., Toibb v. Radloff,* — U.S. —, —, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991); *Patterson v. Shumate,* — U.S. —, —, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992).

 "Plain meaning," however, is only one of a number of rules of statutory construction. Another rule cautions against slavish adherence to the precise verbiage in a statute when the import of the statute is clearly different than those words, standing in splendid isolation, might suggest. *See McCarthy v. Bronson,* — U.S. —, —, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991) (statutory language must always be read in its proper context); *Shell Oil Co. v. Iowa Dept. of Revenue,* 488 U.S. 19, 109 S.Ct. 278, 102 L.Ed.2d 186 (1988) (same); *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 350–51, 64 S.Ct. 120, 123, 88 L.Ed. 88, 93 (1943) (read text in light of context so as to carry out in particular cases the generally expressed legislative policy). In the case of section 707(b), there is virtually no dispute about why Congress enacted this statute, and what it intended to accomplish. Said the Senate Report to the predecessor bill, S. 445,

This provision represents a balancing of two interests. It preserves the fundamental concept embodied in our bankruptcy laws that debtors who cannot meet debts as they come due should be able to relinquish non-exempt property in exchange for a fresh start. At the same time, however, it upholds creditors' interests in obtaining repayment where such repayment would not be a burden.... Nothing in this bill denies such borrowers with unaffordable debt burdens bankruptcy relief under Chapter 7. However, if a debtor can meet his debts without difficulty as they come due, use of Chapter 7 would represent a substantial abuse.

S.REP. No. 65, to Senate Bill 445, 98th Cong., 1st Sess. 43 (1983). Having enacted in 1979 a new Bankruptcy Code under which anyone could, for the first time, file for liquidation relief without having to be "adjudicated a bankrupt," as under the Act, Congress by 1984 came to realize that all too many people who *could* repay their debts would have no motivation to do so, given the ease of painlessly discharging their debts in chapter 7. Section 707(b) was designed to discourage those persons who could repay their debts from using chapter 7 as an "easy out," and in so doing radically departed from the position Congress had taken on this issue when it enacted the Bankruptcy Reform Act of 1978.[2]

Congress then limited the universe of parties with standing to bring an action under the new subsection to U.S. Trustees and the court, to minimize a pendulum swing in the opposite direction, *i.e.*, to prevent creditors from using the new subsection as a club with which to intimidate honest debtors from using chapter 7. 130 CONG.REC. S7624–25 (June 19, 1984) (remarks of Senator Metzenbaum). It also added a precaution that a debtor's right to invoke chapter 7 relief would be presumed, such that affirmative evidence to rebut that presumption would be required. The statute is silent regarding what sorts of things one ought to look for to rebut that presumption, but the legislative history gives clear guidelines for what Congress had in mind.

■ Congress obviously intended that chapter 7 be the debtor's "last resort," when all other practical avenues had failed. *See generally* S.REP. No. 65, *supra.* This is not to say that there must be literally no way that the debtor can repay any of its debts, for the legislative history also notes that it is only where repayment would "not be a burden" and where the debtor can meet its debts "without difficulty" as they come due that a finding of substantial abuse might be appropriate. But we must not be too naive when using these terms, for in one sense, any debt repayment scheme represents a burden to some extent, and any effort to repay such debts normally involves some difficulty. Where there are available mechanisms for repayment that do not represent an undue burden on the debtors, and those remedies have been eschewed, the too-facile resort to chapter 7 as an "easy out" seems to be the sort of conduct which Congress meant to discourage when it enacted section 707(b).[3]

**2.** The House Report to the 1978 Act commented that

This section does not contemplate ... that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal. To permit dismissal on that ground would be to enact a non-uniform mandatory chapter 13, in lieu of the remedy of bankruptcy. The Committee has rejected that alternative in the past, and there has not been presented any convincing reason for its enactment in this bill.

H.REP. No. 595, 95th Cong., 1st Sess. 380 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6336. By 1983, after five years of rapidly escalating filings under the new Bankruptcy Code, Congress evidently found the reasons that had eluded it in 1978, and added subsection (b), together with the explanation that only debtors who cannot repay their debts "without difficulty" should be eligible to remain in chapter 7. Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, Title III, Subtitle A, § 312, Subtitle H, § 475, 98 Stat. 355, 381 (July 10, 1984), *enacted as* 11 U.S.C. § 707(b); S.REP. No. 65, *supra.*

**3.** In another portion of the Senate Report, the Committee noted that "[b]y enabling individuals who *cannot* meet their debts to start a new life, unburdened with debts they *cannot* pay, the bankruptcy laws allow troubled borrowers to become productive members of their communities." S.REP. No. 65, *supra* (emphasis added). The implication is that those who *can* repay

Thus, where there is evidence that chapter 7 was the debtor's first solution to their financial problems coupled with evidence that other solutions were available but not tried, a court is justified in concluding that, absent mitigating factors (discussed below), the case represents a substantial abuse of the provisions of chapter 7.[4]

■■■ This court therefore agrees with the approach implied in *Kelly* and expressed in *Harris*. The primary focus of the court's inquiry in a section 707(b) motion must be first on the debtor's ability to pay his or her debts. In effect, we ought to ask, "Is there *no other choice available?*" Asked in this way, the test becomes broader than simply whether the debtors could fund a chapter 13 plan, for there are other alternatives besides court-supervised repayment systems for working out financial problems, and their availability should not be overlooked as the court works through this "last resort" analysis. For example, many communities (including San Antonio) have consumer credit counseling services available, at little or no charge. These non-profit organizations (actually funded by consumer credit merchants) will help debtors put together a budget, negotiate stand-still agreements with their creditors, and devise a repayment program with-

in the debtor's ability to perform.[5] State court assignments for the benefit of creditors are also available to some debtors. And of course, chapter 13 relief may be available.[6] Even a family-supported voluntary repayment effort could be some evidence that the debtors had tried to work things out before having to file. These kinds of considerations, it seems, are within the legitimate purview of a court faced with a section 707(b) motion.

■■■ Some of the considerations suggested by courts adopting the totality of the circumstances approach represent legitimate mitigating factors to take into account when the filing may indeed not represent the "last resort" of the debtors. For example, proof that the petition was precipitated by some unexpected calamity or unemployment may be relevant to rebut the presumption raised by *Kelly*,[7] as would be proof concerning extraordinary obligations, such as the needs of dependents. But mere proof that the debtor has been honest in his or her presentation of the petition is not particularly relevant for a debtor is expected to be honest in any event, and the presence of such a factor is not really relevant to whether the debtor has (or had)

---

their debts in some fashion are not the intended group to be protected by chapter 7.

**4.** This approach stops far short of imposing a "formula" with which to test ability to repay. The court recognizes that Congress explicitly rejected a future income threshold test for chapter 7 eligibility when it enacted section 707(b) in 1984. *In re Kelly*, 841 F.2d at 914; *In re Green*, 934 F.2d at 571.

**5.** The programs are hardly perfect, of course. Without an automatic stay, they depend on creditor consent, so that just one noncooperative creditor can undermine their effectiveness. By the same token, however, a successfully completed consumer credit counseling program will not have the deleterious effect on a debtor's credit record as will a bankruptcy filing. Too, such programs can be less expensive, as lawyers' and trustee's fees are not incurred.

**6.** Note here that, just because a given debtor is *not* eligible for chapter 13 relief should not be the end of the inquiry. Under the "last resort" analysis adopted here, dismissal may be appro-

priate even for a debtor who, for one reason or another, could not file under chapter 13, if the proof demonstrates that repayment was reasonably available via some alternative mechanism, such as the consumer credit counseling service discussed above. The real point, it seems, of Congress' enacting the law was not so much to steer people into chapter 13 as to discourage chapter 7 filings unless it is the last resort, *i.e.*, unless there is no other practical way to resolve the debt crisis facing the debtor.

**7.** It is important to recognize how the presumptions operate here. *The statute itself raises a presumption in favor of the debtor.* 11 U.S.C. § 707(b). Evidence that there were other workable mechanisms available to the debtor which the debtor made no effort to use rebuts that presumption, for they demonstrate an ability to repay, cancelling out the statutory presumption *that the debtor is a person "who cannot meet their debts."* See S.REP. No. 65, *supra*. This evidence in turn raises the rebuttable presumption suggested by *Kelly* that the case should be dismissed for substantial abuse. The debtor, to rebut that presumption, would then have to put on evidence of one of the mitigating factors.

the ability to pay some significant portion of his or her debts.[8]

■ In applying this "last resort" analysis to the facts of this case, it is clear that the U.S. Trustee's motion is well-taken. The debtors incurred over $40,000 in debt on their credit cards alone, in essence living a lifestyle at some percentage beyond their ability to pay for it. The debtors have the present ability to repay at least some portion of this debt through a chapter 13 plan, and would qualify for such relief. Even were chapter 13 not available, however,[9] these debtors would still have qualified for consumer credit counseling, a course they never pursued. Indeed, Ms. Phipps testified that neither she nor her husband had ever even *prepared* a budget, much less tried to live on one. They anticipate having to continue to live on credit—this time the credit they expect to be available from Ms. Phipps' mother—even after the bankruptcy. Clearly, the debtors have not yet exhausted all the available routes for repaying their debts. Chapter 7 is not, for them, a last resort. To the contrary, chapter 7 is being used here as a means by which they can affirmatively *avoid* repaying some of their creditors, while satisfying the claim of a relative. To this court at least, this is the sort of scenario that Congress had in mind when it enacted section 707(b).

Turning then to the controverting evidence suggested by the debtor, we quickly dismiss as irrelevant to the inquiry evidence regarding the accuracy and truthfulness of the schedules, statement of affairs, and family budget.[10] Largely irrelevant as well is evidence that the petition was filed in good faith,[11] or that the debtors are not engaging in egregious behavior or are not trying to unfairly take advantage of their creditors.[12] Too, the fact that the credit card companies themselves may have contributed to the debt problem by sending the debtors even more credit cards in the mail and by continuing to raise their credit lines, while certainly reprehensible, is not relevant to the inquiry.[13]

Some of the debtor's evidence *is* relevant to the inquiry at hand. For example, the

**8.** Indeed, one of the problems with *Green* is that it mixes the standards for good faith filing with the issue of substantial abuse. Proof that a petition has been filed in bad faith furnishes an independent ground to dismiss the case under section 707(*a*) and under *In re Victory Construction Co., Inc.*, 9 B.R. 570 (Bankr.C.D.Cal.1981). Proof that the petition was *not* filed in bad faith, however, tells us little or nothing about whether the case is a substantial abuse under section 707(b). That is why the Eighth Circuit was correct in rejecting the totality of the circumstances test as enunciated in *Green* for section 707(b) motions. *In re Walton*, 866 F.2d 981, 983 (8th Cir.1989) (§ 707(b) is more than a needless duplication of the other provisions of the Code that have always required petitioners to file in good faith); *In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989) (accord).

**9.** For these debtors, chapter 13 is not so much unavailable as it is undesirable. In a plan, they would have to include the debt to the elder Mrs. Phipps in the same class as their credit card debt, reducing her repayment to something less than fifty cents on the dollar. For personal (and moral) reasons, they want to repay her in full, a goal they could achieve via chapter 7 by simply reaffirming that debt, and discharging the rest.

**10.** Such evidence, it should be emphasized, might well be relevant to the *movant's* case to *support* a motion to dismiss for substantial abuse, if the schedules were inaccurate or misleading, or if the budget were excessive or unreasonable. *In re Krohn*, 886 F.2d at 127; *In re Green*, 934 F.2d at 572; 11 U.S.C. § 707(a).

**11.** *See* footnote 8, *supra.*

**12.** On this point, unfortunately, there is some evidence to indicate that the debtors *are* trying to take advantage of their creditors, by walking away from substantial credit card debt while reaffirming similar unsecured debt to an insider, a course of action available to them only in chapter 7.

**13.** This is the Flip Wilson defense ("the devil made me do it"). The reason it is irrelevant is that our focus is not so much on how the debt was acquired, as it is on the debtor's ability and willingness to repay the debt. Credit card companies often create their own problems by inviting irresponsible use of credit, that is true. Congress easily could have addressed the resulting explosion in insupportable consumer debt by restricting the ability of credit card companies to collect on debt so irresponsibly invited. To date, however, it has not. Instead, Congress decided to approach the problem from the other direction, making it more difficult for consumers to escape paying the debt they incur. That is a legislative choice which cannot properly be invaded by the judiciary, though it can certainly be criticized.

fact that the debtors had consistently paid their credit card bills certainly helps their case, though the fact that they continued to incur new credit card debt (and new debt from the elder Mrs. Phipps as well) does not. Too, the fact that Ms. Phipps needs to cut back on her employment (she has been working two jobs) to avoid complete exhaustion is a legitimate argument to counter the movant's case. In this case, however, it turns out that, even with Ms. Phipps working one job, the debtors could make a significant repayment of their debts.

The debtors place the greatest reliance on the situation of the elder Mrs. Phipps. She has, over the years, literally kept her daughter and son-in-law out of bankruptcy, first by lending them the money to pay their income taxes, then by buying them both the cars they now drive. She took back notes for these obligations (according to the unchallenged testimony of Ms. Phipps), and now relies on the monthly repayments the debtors make them. Recently, the elder Ms. Phipps was divorced, after many years of marriage. She has never herself worked, and now relies solely on whatever payments she receives out of the divorce and from the payments from her daughter and son-in-law involved here.

The debtors argue that, were they required to pursue chapter 13 relief, the resulting diminution in payments to the elder Mrs. Phipps would be detrimental to her.[14] They do not discuss whether she could be repaid in the context of an out-of-court workout, but the inference is that she would not be able to enjoy the preferential payment the debtors intend absent a chapter 7 proceeding. Thus, goes the argument, the debtors are making a legitimate use of chapter 7 notwithstanding their ability to repay their creditors, in order to, in effect, support Mrs. Phipps.

No one can argue with the good intentions of the debtors in this regard, but it is disingenuous to speak of the need to assure the economic survival of their relative when it is their own spending habits which are a direct cause of this endangerment to the elder Mrs. Phipps' economic survival. After all, had they not "hit up" Mrs. Phipps for over $20,000 over the past four years, she would not in all likelihood be looking to their repayment for her current means of support. This is not the same as the more justifiable situation of a parent's having to take care of young children, or a disabled relative, or aged and infirm parents. This, rather, is a problem of the debtors' own making, which can hardly serve as justification for the debtors' attempts to pass off their problems onto their other creditors.

As the record fails to reflect evidence sufficient to rebut the prima facie case made by the U.S. Trustee that chapter 7 does not here represent the last resort that Congress intended it to be, the court concludes that the motion of the U.S. Trustee should be granted.

---

**14.** And detrimental to the debtors, as she has apparently told them that she would lend them more money, but only if they stayed current on their present monthly payments to her.