**In re William Reo HEASLEY, Jr., Janna Louise Heasley, Debtors.**

**Bankruptcy No. 197–10119–7.**

United States Bankruptcy Court,
N.D. Texas,
Abilene Division.

Jan. 21, 1998.

Roger Glandon, Abilene, TX, for debtors.

William S. Parkinson, Dallas, TX, and Harvey L. Morton, Lubbock, TX, for United States Trustee.

## MEMORANDUM OF OPINION ON SUBSTANTIAL ABUSE

JOHN C. AKARD, Bankruptcy Judge.

The United States Trustee seeks dismissal of the Chapter 7 bankruptcy proceedings of

William Reo Heasley, Jr. and Janna Louise Heasley (Debtors) as a substantial abuse of the bankruptcy system under § 707(b) of the Bankruptcy Code.[1] The Debtors acknowledge that they intend to discharge a large number of unsecured debts in this bankruptcy case, but they will pay a substantial group of unsecured debts after the discharge. The court finds the Debtors' attempts to use the Bankruptcy Code as a vehicle to prefer one group of unsecured creditors over another constitutes substantial abuse under § 707(b) and that this case should be dismissed.[2]

### Facts

The matter was submitted to the court on the following stipulations of fact:

1. The Debtors filed a voluntary Chapter 7 petition on February 10, 1997.

2. Mr. Heasley is 58 years old and is in semi-retirement. He works as a driver for Fred Garrison Oil Company. Mrs. Heasley is 59 years old and is a bookkeeper. Mr. Heasley is paid on an hourly basis. His wages are seasonal in that the hours he worked (sic) depends upon the fuel needs of his customers. Mrs. Heasley is also an hourly employee. Her wages are subject to the hours she is requested to work and commissions she receives.

3. The Debtors listed on Schedule F (as amended) $107,815.01 in unsecured debt. These are primarily credit card debts incurred to purchase goods and services. They are primarily consumer debts as defined by 11 U.S.C. § 101(8).

4. Of the debts listed on Schedule F (as amended), the following were incurred on credit cards obtained by Mrs. Heasley in her ex-husband's name without his permission or authority:

| | Creditor | Account No. | Amount |
|---|---|---|---|
| a. | Chase Gold Visa | 4226–9001–0541–4230 | $10,184.82 |
| b. | First USA Bank–Visa Card | 4417–1129–5342–9620 | $ 5,055.43 |
| c. | Household Credit Service, Inc. | 4200–4201–1131–4142 | $ 8,395.62 |
| d. | Household Credit Services, Inc. | 5016–4712–1001–2674 | $ 7,835.06 |
| e. | Household Credit Services, Inc. | 4200–4300–2001–4766 | $ 8,578.36 |
| f. | MBNA America | 5329–0000–5460–1102 | $ 9,603.17 |
| | Total | | $49,652.46 |

5. The Debtors' Schedule I correctly represents their average monthly income. The Debtors have combined average monthly net income of $2,580.00.

6. The Debtors' Schedule J (as amended) correctly represents their average monthly expenses. The debtors have average monthly expenses of $2,766.14.

7. Included in the Debtors' Schedule J (as amended) is a monthly expense of $439.14 which is denoted as "Reaff on Retained Prop." This monthly expense represents the monthly payments due on the debt that will be reaffirmed pursuant to 11 U.S.C. § 524(c) on property to be retained by the Debtors per Debtors' Statement of Intention. Without this monthly expense, the Debtors' average monthly expenses are $2,327.00.

8. Included in the Debtors' Schedule J (as amended) is a monthly expense of $633.00 which is denoted as "Nondischargeable Cr. Cards". This monthly expense represents the minimum monthly payments the creditors have agreed to accept on the debts enumerated above in Paragraph 4. Without this monthly expense, the Debtors' average monthly expenses are $2,133.14.

9. Without the monthly expenses listed above in Paragraph 6 ($439.14—debt to be

---

1. The Bankruptcy Code is 11 U.S.C. § 101 *et seq.* References to section numbers are references to sections in the Bankruptcy Code.

2. This court has jurisdiction of this matter under 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and Miscellaneous Rule No. 33 of the Northern District of Texas contained in Order of Reference of Bankruptcy Cases and Proceedings *Nunc Pro Tunc* dated August 3, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1), (b)(2)(I), and (J).

reaffirmed on retained property) and Paragraph 7 ($633 .00—minimum monthly payments on nondischargeable credit card debts), the Debtors' average monthly expenses are $1,694.00.

10. If one uses the amount of $2,766.14 as the Debtors' average monthly expenses(as per Debtors' Schedule J [as amended] and Paragraph 6 above), the Debtors have no net monthly resources with which to fund a Chapter 13 Plan.

11. If one uses the amount of $2,327.00 as the Debtors' average monthly expenses(as per Debtors' Schedule J [as amended] and Paragraph 7 above—i.e. not including any of the debt to be reaffirmed on retained property), the Debtors have net monthly resources of $253.00 with which to fund a Chapter 13 plan. Accordingly, if the Debtors devoted all of their disposable income to a Chapter 13 plan, they could repay all unsecured creditors approximately $9,108.00 or 8.45% under a 36 month Chapter 13 plan; or $15,180.00 or 14.08% under a 60 month Chapter 13 plan.

12. If one uses the amount of $2,133.14 as the Debtors' average monthly expenses (as per Debtors' Schedule J [as amended] and Paragraph 8 above—i.e. not including any of the minimum monthly payments on the nondischargeable credit card debts), the Debtors have net monthly resources of $446.86 with which to fund a Chapter 13 plan. Accordingly, if the Debtors devoted all of their disposable income to a Chapter 13 plan, they could repay all unsecured creditors $16,086.96 or 14.92% under a 36 month Chapter 13 plan; or $26,811.60 or 24.87% under a 60 month Chapter 13 plan.

13. If one uses the amount of $1,694.00 as the Debtors' average monthly expenses (as per Debtors' Schedule J [as amended] and Paragraph 9 above—i.e. not including any of the debt to be reaffirmed on retained property or any of the minimum monthly payments on nondischargeable credit card debts), the Debtors have net monthly resources of $886.00 with which to fund a Chapter 13 plan. Accordingly, if the Debtors devoted all of their disposable income to a Chapter 13 plan, they could repay all unsecured creditors approximately $31,896.00 or 29.58% under a 36 month Chapter 13 plan; or $53,160.00 or 49.31% under a 60 month Chapter 13 plan.

14. [The stipulation incorporated by reference the Debtors' answers to interrogatories propounded by the United States Trustee. The court's opinion will refer to the interrogatories only as necessary to the decision in this matter.]

15. As set forth in Debtors' answer to interrogatory no. 6, Debtors seek to reaffirm other debts in addition to the debts referenced on Schedule J. The minimum monthly payments for these debts, excluding the Chevron and Fina gasoline credit cards, is $224.87.

16. [Copies of the Debtors' Schedules F, I, and J were made exhibits to the stipulation.]

17. The Debtors have elected not to voluntarily convert this case to a Chapter 13.

A review of the case file and of the Debtors' answers to interrogatories propounded by the United States Trustee discloses additional facts which have a bearing on the decision in this matter. Additionally, the parties referred to many of them in arguments. The Debtors filed their voluntary Chapter 7 petition on February 10, 1997. Schedule F indicated $50,294.99 in unsecured debts. All of the debts were for credit card purchases, with the exception of one medical bill in the amount of $191.51. Total debts were listed at $110,267.99. On March 14, 1997, the Debtors filed an Amended Schedule F, which added numerous other credit card obligations. The amended schedules listed total unsecured debt at $149,788.61 and showed total debts of $209,761.61.

On August 5, 1997, the eve of the first setting on the United States Trustee's motion, the Debtors filed another set of amended schedules. When compared to the first amended schedules, the second amended schedules reduced a secured claim from $24,000 to $6,000, without offering any explanation for the reduction. The unexplained omission of two substantial obligations to Texas banks reduced the schedule of unsecured debts to $107,815.01. As a result of these changes, the total indebtedness was reduced to $149,788.01. The Debtors' sched-

ule of expenses showed they paid $633 per month on nondischargeable credit card obligations and $439.14 monthly on reaffirmed property.

The $439.14 monthly payment on reaffirmed property was not explained in the schedules or in the evidence presented to the court. A statement of intention was included in the original schedules and in the first amended schedules filed March 14, 1997. There was no statement of intention included in the second amended schedules filed August 5, 1997. The two statements of intention filed are identical. They indicate that the Debtors will reaffirm an obligation on "Debtor's homestead" in favor of Citizens National Bank and two debts on "Debtor's home" to First American Bank and Rockwell Bank, N.A. The list of secured creditors on Schedule D shows that Citizens National Bank of Breckenridge, Texas, has a purchase money lien in the amount of $17,973 on the Debtors' home, which has a value of $48,000. The schedule of current expenses shows a monthly mortgage payment of $261, which, presumably, is for that home. The Debtors claimed the property upon which the Citizens National Bank has a lien as exempt. Schedule D lists First American Bank with a contingent debt of $18,000 for "purchase money lien on house sold." That schedule lists Rockwell Bank, N.A. with a contingent debt of $6,000 [3] for an "M & M lien on house sold." Both the original and first amended schedules reflect co-debtors obligated on the debts to First American Bank and Rockwell Bank, N.A. The Debtors' schedules show that they own two vehicles, but there are no liens on those vehicles. Consequently, the court cannot find any substantiation for the asserted monthly expense on reaffirmed debts.

In Stipulation 4 and in answers to interrogatories propounded by the United States Trustee, the Debtors admitted that six of the credit cards listed in the Amended Schedules were obtained by Mrs. Heasley in her ex-husband's name with neither his permission nor his authority. The charges made on these cards, which totaled almost $50,000, as well as the other credit card charges were used to purchase consumer goods, to pay medical bills, to assist a son with chemical dependency problems with treatment, bail and legal fees, to assist another son with medical expenses, and to pay some expenses for their grandchildren.

The United States Trustee filed a Motion to Dismiss on May 16, 1997 asserting that the Debtors had the ability to repay their unsecured creditors $87,120, but were using the bankruptcy process to pay only those credit card creditors who threatened criminal prosecution while discharging the rest of their credit card debt. The Debtors were making minimum payments of $633 monthly on the fraudulently obtained credit cards.

The Chapter 7 Trustee reports that there will be no distribution for unsecured creditors in this case.

### Issue

The issue before the court is whether the Debtors' case should be dismissed for substantial abuse pursuant to § 707(b).

### Statutes

§ 707 reads in pertinent part:

. . . .

(b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There should be a presumption in favor of granting the relief requested by the debtor.

### Discussion

■ Congress added § 707(b) to Chapter 7 of the Bankruptcy Code in The Bankruptcy Amendments and Federal Judgeship Act of 1984. It did so in an attempt to respond to complaints that debtors who could pay a substantial portion of their debts from future income were receiving discharges. The Senate Report stated:

This provision represents a balancing of two interests. It preserves the fundamen-

---

**3.** The debt was listed at $24,000 in both the original and first amended schedules.

tal concept embodied in our bankruptcy laws that debtors who cannot meet debts as they come due should be able to relinquish non-exempt property in exchange for a fresh start. At the same time, however, it upholds creditors' interests in obtaining repayment where such repayment would not be a burden. Crushing debt burdens and severe financial problems place enormous strains on borrowers and their families. Family life, personal emotional health, or work productivity often suffers. By enabling individuals who cannot meet their debts to start a new life, unburdened with debts they cannot pay, the bankruptcy laws allow troubled borrowers to become productive members of their communities. Nothing in this bill denies such borrowers with unaffordable debt burdens bankruptcy relief under Chapter 7. However, if a debtor can meet his debts without difficulty as they come due, use of Chapter 7 would represent a substantial abuse.

S.REP. No. 98–65 (1983) (Senate report accompanying § 445, Omnibus Bankruptcy Improvements Act of 1983, which was a forerunner to the Bankruptcy Amendments and Federal Judgeship Act of 1984). Norton Bankr.Law & Practice 2d at 730 (1997–98).

In defining substantial abuse, the Ninth Circuit focused on the debtor's ability to pay a substantial portion of his debts from future income. *Zolg v. Kelly (In re Kelly),* 841 F.2d 908 (9th Cir.1988). The court noted that in determining ability to pay, many courts looked to the debtor's ability to fund a Chapter 13 plan *Id* . at 914. Reviewing the legislative history of § 707(b), the court concluded:

. . . .

[T]he committee report on the final version of S. 445 states clearly that dismissal for substantial abuse is intended to "uphold[ ] creditors' interests in obtaining repayment where such repayment would not be a burden," and that "if a debtor can meet his debts without difficulty as they come due, use of Chapter 7 would represent a substantial abuse." S.Rep. No. 65, 98th Cong., 1st Sess. 53, 54 (1983). Accordingly, we hold that the debtor's ability to pay his debts when due, as determined by his

ability to fund a chapter 13 plan, is the primary factor to be considered in determining whether granting relief would be a substantial abuse.

. . . .

This is not to say that inability to pay will shield a debtor from section 707(b) dismissal where bad faith is otherwise shown. But a finding that a debtor is able to pay his debts, standing alone, supports a conclusion of substantial abuse.

*Id.* at 914–15 (footnotes omitted).

The Eighth Circuit agrees with the reasoning and result in *Kelly. See In re Walton,* 866 F.2d 981, 985 (8th Cir.1989) and *United States Trustee v. Harris,* 960 F.2d 74, 77 (8th Cir.1992). In addition "the court may take the petitioner's good faith and unique hardships into consideration under section 707(b)." *Walton* at 983 (citing *In re Grant,* 51 B.R. 385, 393–94 (Bankr.N.D.Ohio 1985)).

The Fourth Circuit rejected the use of the debtor's ability to pay as the sole factor to be considered in determining substantial abuse, instead adopting a "totality of the circumstances" test. *Green v. Staples (In re Green).* 934 F.2d 568 (4th Cir.1991). The court stated that a "totality of the circumstances" approach should evaluate such factors as the following:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment.

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay.

(3) Whether the debtor's proposed family budget is excessive or unreasonable.

(4) Whether the debtor's schedules and statement of current income and expenditures reasonably and accurately reflect the true financial condition.

(5) Whether the petition was filed in good faith.

. . . .

Exploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b);

abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors.

*Id.* at 572.

The Sixth Circuit adopted what has been characterized as a middle ground. *In re Krohn,* 886 F.2d 123 (6th Cir.1989). The court said:

Those courts which have reviewed the legislative history, have generally concluded that, in seeking to curb "substantial abuse," Congress meant to deny Chapter 7 relief to the dishonest or non-needy debtor. In determining whether to apply § 707(b) to an individual debtor, then, a court should ascertain from the totality of the circumstances whether he is merely seeking an advantage over his creditors, or instead is "honest," in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings, and whether he is "needy" in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets. Substantial abuse can be predicated upon either lack of honesty or want of need.

It is not possible, of course, to list all the factors that may be relevant to ascertaining a debtor's honesty. Counted among them, however, would surely be the debtor's good faith and candor in filing schedules and other documents, whether he has engaged in "eve of bankruptcy purchases," and whether he was forced into Chapter 7 by unforeseen or catastrophic events.

Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings. That factor alone may be sufficient to warrant dismissal. For example, a court would not be justified in concluding that a debtor is needy and worthy of discharge, where his disposable income permits liquidation of his consumer debts with relative ease. Other factors relevant to need include whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities.

*Id.* at 126–27 (citations omitted). See also *In re Ontiveros,* 198 B.R. 284 (C.D.Ill.1996) (giving a detailed analysis of the positions of the Fourth, Sixth, Eighth, and Ninth Circuits).

The parties have not cited the court to, nor has the court been able to find, any case by the Fifth Circuit defining substantial abuse. Bankruptcy Judge Leif Clark of the Western District of Texas analyzed the factors raised in the various Circuit opinions and adopted the *Kelly* rationale. *In re Fitzgerald,* 155 B.R. 711 (Bankr.W.D.Tex.1993).

▮ Congress did not define substantial abuse, leaving it to the courts to determine on a case by case basis. For this reason, the modified totality of the circumstances approach announced in *Krohn* which allows the court to review several factors, including the debtor's ability to pay, seems to more closely reflect Congressional intent. In most cases, the court should consider a number of factors in reaching its decision, but there are undoubtedly situations, as suggested in *Krohn,* in which the ability to repay debts out of future earnings alone may be sufficient to warrant dismissal.

Because each case is different, the *Krohn* court did not set out definitive factors for consideration in deciding a § 707(b) case. For ease of analysis, this court will refer to the factors described by the *Green* court. The first factor inquires whether the petition was filed because of sudden illness, calamity, disability, or unemployment. There is no evidence of any of those matters being present in this case.

The second factor is whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay. These Debtors clearly did that. The evidence indicates that a portion of the funds they obtained through the use of credit cards was used to assist a son with chemical dependency problems to pay for treatment, bail, and legal fees, to assist another son with

medical expenses, and to pay for braces for grandchildren. However, the evidence does not reflect the amounts spent on these items. It is difficult to fault the Debtors for trying to assist their children · and grandchildren. However, such actions should not be taken at the expense of the Debtors' creditors. The Debtors' schedules show that their gross annual income (before deduction for taxes) is $36,600. Depending on the set of schedules used, their total debt is between three and five times their gross annual income, most of it for unsecured credit card obligations.

The third factor is whether the debtor's proposed family budget is excessive or unreasonable. Insofar as living expenses are concerned, these Debtors' budget might be questionable as to one or two items but, on the whole, it is reasonable. The excessive part of their budget is the $633 per month they propose to pay on the credit card debts charged in Ms. Heasley's former husband's name, and the $439.14 unexplained reaffirmation on retained property. ·These two items represent expenses of over $1,000 per month; funds which could be paid to unsecured creditors.

The fourth area of inquiry is whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect his true financial condition. The fact that these Debtors gave three ·different figures for their total debt, varying between $110,000 and $209,000, raises real concerns about the accuracy of their schedules. In responses to interrogatories they indicated that they owned a second house, but the schedules show that it had been sold.

The fifth factor is whether the petition was filed in good faith. The court heard no direct evidence on this point, but it appears that the Debtors thought that they were acting in good faith and had been brought to their knees by too much debt. An answer to an interrogatory states that at some undisclosed time, Mr. Heasley cashed in a $30,000 retirement fund and used the money to pay creditors. However, in the bankruptcy context, good faith is measured by actions rather than by the subjective feelings of the parties. The Debtors' actions in this case show a lack of good faith evidenced by their attempt to prefer one group of creditors over another. They intend to pay in full the debts on credit cards which Ms. Heasley secured in her former husband's name. These debts approximate $50,000 (Stipulation 4). Apparently they intend to reaffirm other debts and pay $439.14 per month to retain those items (Stipulation 7). Those debts were not adequately disclosed in the schedules. The Debtors listed eight other credit cards and one creditor, whose debts they intended to reaffirm in addition to the $50,000 of debts described in Stipulation 4. The minimum monthly payment on those debts, excluding two gasoline credit cards, is $224 .87 (Stipulation 15). Those payments were not shown in their schedule of expenses.

The sixth factor is the relation of a debtor's future income to future necessary expenses. As demonstrated by the stipulations in this case, not all creditors would be paid in full, but substantial payments could be made to all creditors out of these Debtors' future income.

Two courts have held that filing Chapter 7 with an intent to discharge some unsecured debts while fully paying other unsecured debts, coupled with the financial ability to pay substantial amounts to all creditors in a Chapter 13 plan, constitutes substantial abuse warranting dismissal of the Chapter 7 case. *In re Shands,* 63 B.R. 121 (Bankr. E.D.Mich.1985); *Fitzgerald, supra.*

### Conclusion

This case reveals two very sad truths. The first is that these Debtors have not learned how to say "no" to their children. The Debtors are reaching the age at which they need to provide for themselves. They should not be expected to support their children and grandchildren. It is time that their children took care of themselves.

The second sad truth is that these Debtors have not learned to manage money. Undoubtedly, a large portion of their debt represents interest which accrued on these accounts while they were making minimum payments. The evidence shows they borrowed from one account to pay another and lost Mr. Heasley's retirement in the process. They need help in budgeting and money

management. That help is available from the County Agricultural Extension Agent and various other places. The court hopes they will avail themselves of that opportunity.

The Bankruptcy Code should be used as a shield to protect honest but insolvent debtors from the collection efforts of creditors and to give the debtors a fresh start in their financial lives. It should not be used as a sword to prefer one creditor over another. Unfortunately, that is what these Debtors are trying to do. They want to wipe out some debts and at the same time use their disposable income to pay a preferred group of creditors. The totality of the circumstances in this case leads this court to find that the case is a substantial abuse of the bankruptcy system and that it must be dismissed pursuant to § 707(b).

ORDER ACCORDINGLY.[4]

---

**4.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to FED.

R.BANKR.P. 7052. This Memorandum will be published.