**In re Donn B. & Donna M. CARLTON, Debtors.**

**In re Robert N. & Karen E. KORNFIELD, Debtors.**

**Bankruptcy Nos. 96–23200, 96–22165.**

United States Bankruptcy Court, W.D. New York.

June 23, 1997.

or's Opposition to the City's Motion makes reference to fixtures valued at $1 million.

**470**

Thomas Corletta, Rochester, NY, for Carlton Debtors.

David MacKnight, Lacy, Katzen, Ryen & Mittleman, Rochester, NY, for Kornfield Debtors.

Peter Scribner, Rochester, NY, Chapter 7 Trustee.

Trudy A. Nowak, Rochester, NY, Assistant U.S. Trustee.

## DECISION & ORDER

JOHN C. NINFO, II, Bankruptcy Judge.

## BACKGROUND

### I. *Carlton Chapter 7 Case*

On October 29, 1996, Donn B. Carlton & Donna M. Carlton (the "Carltons") filed a petition initiating a Chapter 7 case. On the same day that they filed their petition, the Carltons filed the lists, schedules and statements (the "Carlton Schedules") required by Rule 1007. These Schedules set forth that the Carltons had a current combined gross annual salary of $114,634.20, in that: (1) Donn B. Carlton had been employed at Eastman Kodak Company for 24 years as a machinist and had a current gross annual salary of $75,966.36; and (2) Donna M. Carlton had been employed by IBM for 17½ years as a computer software analyst and had a current gross annual salary of $38,667.84. These

Schedules also set forth that the Carltons, whose two teenage children lived with them: (1) had current monthly living expenses of $4,834.02 ($58,008.24 annualized); (2) had unsecured debts consisting of a personal loan, a line of credit, credit card and store charge balances totaling $35,525.47; (3) owned a residence valued at $114,900.00 subject to a first and second mortgage with combined outstanding balances of $104,268.55; (4) owned household goods and furnishings with a value of only $750.00 and wearing apparel with a value of only $250.00; and (5) owned a 1980 Ford Thunderbird, two 1989 Ford Pick–Up Trucks, a 1992 8½ foot truck camper and a 1989 4–stall horse trailer.

On January 7, 1997, after their Section 341 meeting of creditors, the Debtors filed amended schedules of income and expenses (the "Carlton Amended Schedules"). These Amended Schedules showed that the Carltons had a current combined gross annual salary of $101,140.80, combined monthly payroll deductions of $3,066.27, including $332.05 per month in 401–K and SIP contributions, and $5,192.27 in current monthly living expenses ($62,307.24 annualized), $358.25 more than the monthly expenses set forth in the Carlton Schedules. These monthly living expenses included $850.00 for food and lunches, $150.00 for clothing purchases, $150.00 in recreation related items and $75.00 for pet care.

On February 4, 1997, the United States Trustee (the "U.S. Trustee") filed a motion (the "Carlton Substantial Abuse Motion") requesting that the Carltons' Chapter 7 case be dismissed pursuant to Section 707(b)[1] for substantial abuse. The Motion alleged that: (1) although the Carltons had no non-exempt equity in their residence, they paid over $1,800.00 in combined monthly mortgage payments to maintain the residence; (2) the Carltons paid a total of $571.00 in monthly payments on one of their 1989 Ford Pick–Up trucks, the 1992 truck camper and a John Deere farm tractor, all of which would be

---

1. Section 707(b) provides:
   After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose

debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

paid off within approximately two years; (3) the Carltons' unsecured debt of in excess of $35,000.00 was consumer debt comprised of charge cards, a personal loan and a line of credit; (4) both of the Carltons have had long-term stable employment with good incomes, and they had not recently experienced any "catastrophic event", such as a serious medical problem, a job loss or a business failure, which required them to seek immediate bankruptcy relief; (5) in addition to their monthly payroll deductions for 401–K and SIP contributions totaling $332.05, Donn Carlton also had a monthly deduction for a SIP loan payment of $259.29 in connection with his SIP account which had a balance of $10,952.06 after deducting the outstanding loan balance of $7,567.66; (6) in order to pay off the principal balance of their outstanding unsecured debt, the Carltons would need to pay $987.00 per month (12% of their gross income) over three years or $593.00 per month (7% of their gross income) over five years; and (7) based on a totality of the circumstances approach, it appeared that the Carltons' Chapter 7 case should be dismissed as a substantial abuse in view of the facts that: (a) the Carltons have long-term stable employment and a significantly higher than average combined income; (b) the Carlton's unsecured debt is consumer debt; (c) some of the Carlton's outstanding secured debt will be paid off shortly and other secured debt will be paid off within approximately two years, freeing up additional cash flow for debt repayment; (d) the Carltons have chosen to expend the sum of $1,800.00 per month on the first and second mortgages on their residence even though they have very little equity in it; (e) the Carltons have elected to retain three vehicles with corresponding monthly payments; and (f) the Carltons' living expenses, although they may be actual expenses, far and away exceed the expenses of a typical family of four in the Rochester, New York area, and the expenses that would be permitted under a Chapter 11 or Chapter 13 plan.

On February 18, 1997, the Carltons interposed an Answering Affirmation (the "Carlton Answer"), which alleged that: (1) there is a presumption in Section 707(b) that debtors are entitled to Chapter 7 relief; (2) although an important factor in determining whether granting a debtor relief under Chapter 7 would be a "substantial abuse" is the ability to repay existing debt, it is not the sole factor to be considered by the Court; (3) the Carlton Substantial Abuse Motion was a thinly veiled attempt by the U.S. Trustee to force the Carltons into Chapter 13; (4) Donn Carlton is 45 years old and cannot continue to work the kind of overtime he has voluntarily worked for the last several years ($20,000.00 in annual overtime income); (5) the Carltons have two children who are nearing college age (14 and 16), so that the overall family expenses will increase in the near future and not allow for the payment of any debt service on the Carlton's existing unsecured debt or the funding of a Chapter 13 plan; and (6) the only creditors that would be prejudiced by the Carltons' Chapter 7 bankruptcy and a resulting discharge are unsecured, high-risk, high interest rate creditors, who would benefit the least in any Chapter 13 proceeding due to the minimum nature of the payment the Carltons could reasonably afford.

## II. *Kornfield Chapter 7 Case*

On July 30, 1996, Robert N. Kornfield and Karen E. Kornfield (the "Kornfields") filed a petition initiating a Chapter 7 case. On the same day that they filed their petition, the Kornfields filed the lists, schedules and statements (the "Kornfield Schedules") required by Rule 1007. The Schedules showed that the Kornfields: (1) owned household goods and furnishings with a value of $4,000.00, wearing apparel with a value of $2,000.00 and no furs and jewelry; (2) had interests in IRA, ERISA, Keough or other pension or profit-sharing plans with A.G. Edwards & Sons, Inc. ("Pension Plans") with a value of $390,216.00; (3) owned a 1989 Plymouth Voyager with a value of $2,000.00, and leased a 1994 Plymouth Grand Voyager and a 1996 Landrover Rangerover; (4) owed 1995 New York State income taxes of approximately $36,000.00; (5) owed $584,694.00 in unsecured, nonpriority claims, including: (a) $332,680.00 due to First Federal Savings & Loan Association ("First Federal") on a first mortgage on a previously owned and fore-

closed residence; (b) $175,983.92 due to First Union Home Equity Bank ("First Union") on a second mortgage on the previously owned and foreclosed residence; and (c) approximately $34,000.00 in credit card purchases; (6) had current monthly living expenses of $13,115.00 ($157,380.00 annualized), which included: (a) $3,000.00 to rent a home; (b) $120.00 for telephone; (c) $1,200.00 for food; (d) $400.00 for clothing purchases; and (e) 4,470.00 for tuition expenses ($53,640.00 annualized). The Schedules also showed that the debtor, Robert Kornfield ("Dr.Kornfield"), a physician, had $472,445.00 in self-employment income (net before taxes) in 1994, $311,654.00 in self-employment income (net before taxes) and $92,939.00 in employment income in 1995, and $176,912.00 in payroll through July 22, 1996. More particularly, on Schedule I, Dr. Kornfield showed gross monthly wages of $23,000.00 and monthly payroll deductions of $12,790.00, including $1,100.00 for profit-sharing.

On September 5, 1996, the Kornfields' Chapter 7 Trustee [2] (the "Trustee") conducted a Section 341 meeting of creditors and later that day the Kornfields filed an Amendment to their Schedules (the "Kornfield Amended Schedules") which, on the cover sheet, indicated that Schedules F and J (current expenditures) were being amended. However, the Amended Schedules filed with the Court did not include a new Schedule J but only an additional copy of the Schedule filed with the Kornfield Schedules.

On September 6, 1996, the Trustee objected to the Kornfields' claim that the Pension Plans were fully exempt.

On October 28, 1996, the Court entered an order (the "Extension Order"), granting the ex parte motion of the U.S. Trustee, extending the time of the U.S. Trustee to bring a substantial abuse motion, having determined, based upon the U.S. Trustee's Motion papers which indicated among other things, that the Kornfields had a very high annual income and the Trustee required further information regarding their income and Pension Plans, that there was proper cause as required by Rule 1017(e).

On January 7, 1997, the U.S. Trustee filed a motion (the "Kornfield Substantial Abuse Motion") requesting that the Kornfields' Chapter 7 case be dismissed pursuant to Section 707(b) for substantial abuse. The Motion alleged that: (1) the Motion had been brought within the time provided for by the Extension Order; (2) the Kornfields' debts were primarily consumer debts; (3) Dr. Kornfield's gross annual income shown on the Kornfield Schedules was $276,000.00, although for 1994 and 1995 his average gross annual income exceeded $425,000.00; (4) the Kornfields had Pension Plans with a value of in excess of $390,000.00; (5) the Kornfields leased two vehicles, a 1994 Plymouth Grand Voyager and 1996 Landrover Rangerover; and (6) the Kornfields had unpaid mortgage obligations on a previously owned residence of in excess of $507,000.00. The Motion further asserted that under a totality of the circumstances approach, the Kornfields' Chapter 7 case should be dismissed as a substantial abuse, "strictly on the basis of the Debtors' gross income, extent of exempt assets, and amount and type of debt."

On January 23, 1997, the Trustee filed an Affirmation (the "Trustee Affirmation") in support of the Kornfield Substantial Abuse Motion, which asserted that: (1) the Kornfields' monthly household income greatly exceeded their necessary household expenses by perhaps as much as $10,000.00; (2) at their income level, it was fundamentally unfair to creditors and an abuse of the policies, provisions and spirit of the Bankruptcy System for the Kornfields to seek a Chapter 7 discharge; (3) a review of various pay stubs supplied to the Trustee by the Kornfields indicated that Dr. Kornfield may have an actual gross monthly salary of between $23,000.00 ($276,000.00 annualized), and $30,031.00 ($360,372.00 annualized); (4) based on Dr. Kornfield's 1994 and 1995 income, together with the various pay stubs reviewed by the Trustee, it was not unreasonable to conclude that his actual average gross monthly salary was $28,000.00 ($336,000.00 annualized); (5) although the Kornfield Schedules indicated a monthly deduction for payroll taxes and Social Security which rep-

---

2. The same Chapter 7 Trustee was appointed for the Carltons and the Kornfields.

resented 50.82% of gross income, a review of the Kornfields' 1994 and 1995 tax returns and the actual deductions shown on the various pay stubs reviewed by the Trustee, resulted in the Trustee concluding that the actual monthly payroll deductions should be approximately 40% of gross income ($11,200.00 on a $28,000.00 gross monthly salary); (6) although the Schedules indicated an $1,100.00 deduction for a pension loan repayment, the pay stubs reviewed by the Trustee did not show any such deduction; (7) according to the Trustee's estimates, using $28,000.00 in gross monthly salary, $11,200.00 in payroll deductions, $16,800.00 in net monthly salary or $15,700.00 if a $1,100.00 monthly pension loan payment was being made, the Kornfields would have a net annual salary of $188,400.00. The Trustee Affirmation also asserted that: (1) the scheduled current monthly living expenses of $13,115.00 for the Kornfields and their four children was more than five times the expenses of the four-person or more households the Trustee saw in his other cases for the prior month, and nearly four times the per person expenses of those households; (2) based upon his experience as a Trustee and practitioner, the following monthly expenses of the Kornfields were excessive: (a) $3,000.00 for the rental of a home, even for six people; (b) $120.00 for telephone; (c) $1,200.00 for food; (d) $375.00 for gas and repairs; and (e) $4,470.00 in tuition expenses ($53,640.00 annualized); and (3) based upon his experience as a Trustee and practitioner, the Kornfields and their children could meet all of their *necessary* household expenses in the Rochester, New York area for approximately $6,000.00 per month.

On January 31, 1997, an Affirmation was filed on behalf of First Union (the "First Union Affirmation") in support of the Kornfield Substantial Abuse Motion, which asserted that: (1) the Kornfields were not in need of Chapter 7 bankruptcy relief; (2) an attached loan application submitted in January, 1995 showed the Kornfields had a base gross annual income of $550,000.00; (3) the Kornfields' total monthly living expenses were clearly unreasonable and excessive, particularly the rental and tuition payments; and (4) under a totality of the circumstances analysis, the Kornfields' Chapter 7 case should be dismissed for substantial abuse, because: (a) the Kornfields' income would be sufficient to pay a substantial portion or a substantial amount of money through a plan of reorganization if the Kornfields reduced their living expenses to meet their reasonable and necessary needs; and (b) the Kornfields' bankruptcy was not filed in response to a catastrophic event such as a sudden illness, calamity, disability or unemployment, but was due to a reduction in Dr. Kornfield's business and an unwillingness to reduce a lavish lifestyle to repay at least some of what was owed to the Kornfields' creditors.

On February 7, 1997, the Kornfields filed opposition (the "Kornfield Opposition") to the Kornfield Substantial Abuse Motion which alleged that: (1) Dr. Kornfield suffered a decrease in income between 1995 and 1996, as set forth on an attached analysis by Dr. Kornfield's accountant which showed that for tax purposes, his income from his medical practice had dropped from $404,050.00 in 1995 to $318,127.00 in 1996; (2) this decrease in income was due to changes in the health care industry, which were likely to continue in the future and possibly reduce his income even further; (3) the tuition expenses being paid by the Kornfields were not a luxury, since the best possible education was something that parents were responsible to provide to their children; (4) two of the Kornfield children had special educational and medical needs; one suffered from Attention Deficit/Hyperactivity Disorder and the other from long-standing emotional or psychological disorders, including low self-esteem, which required ongoing psychiatric assistance; (5) the cost of Ritalin for the Kornfield child suffering from Attention Deficit/Hyperactivity Disorder was $800.00 annually; (6) the Kornfields' monthly expenses for food were reasonable because of the children's medical conditions and the need to entertain for professional reasons, since Dr. Kornfield receives substantially all of his business from referrals; (7) the Kornfields had surrendered the Plymouth Grand Voyager; and (8) substantial income alone is not a sufficient basis to dismiss a case for substantial abuse.

On February 7, 1997, the Kornfields filed a Memorandum of Law (the "Kornfield Memorandum") which asserted that: (1) the Kornfields' income was likely to decrease in the future because of systematized changes in the medical insurance and reimbursement payment system toward greater cost control measures; (2) given the Kornfields' actual expenses, which the U.S. Trustee had not expressed specific objection to, they had no disposable income with which to pay creditors; (3) the Kornfields believed that they were not eligible for Chapter 13 because the amount of their unsecured debt exceeded the permissible limit of $250,000.00; (4) since Dr. Kornfield's earnings from personal services would not be property of a bankruptcy estate in a Chapter 11 case, any such Chapter 11 case the Kornfields filed would likely result in a no asset liquidation; (5) the Trustee had no standing to request or suggest grounds for dismissal in addition to those raised by the U.S. Trustee, so that any new or expanded matters brought up by the Trustee in his submission should not be considered by the Court in making its decision; and (6) the Kornfields believed that the U.S. Trustee wished to test whether an income like that earned by Dr. Kornfield could, by itself, constitute a substantial abuse, however, the legislative history to the 1986 Amendments to the Bankruptcy Code indicated that a future income test as the sole basis for a finding of substantial abuse had been rejected by Congress.

On February 11, 1997, the Trustee filed a Supplemental Affirmation (the "Supplemental Affirmation"), which asserted that: (1) the details set forth in his Affirmation were not an independent motion to dismiss for substantial abuse, but simply expanded on the U.S. Trustee's emphasis on the Kornfields' substantial income as a significant factor which the Court should weigh in making a totality of the circumstances determination; and (2) Exhibit B of the Kornfield Opposition, prepared by their accountant, confirmed that Dr. Kornfield's 1996 gross monthly income was $26,510.58 ($318,126.96 annualized) more than the $23,000.00 figure reported in the Kornfield Schedules.

Also on February 11, 1997, the Kornfields submitted a supplemental response (the "Kornfield Supplemental Objection"), which, among other assertions, contended that no creditor had asserted any fraud or wrongdoing in connection with any of the obligations incurred by the Kornfields.

On February 12, 1997, the Court heard oral arguments on the Carlton and Kornfield Substantial Abuse Motions, reserved on both Motions and advised the parties that it would decide them together.

On February 25, 1997, the U.S. Trustee submitted a Letter–Memorandum in connection with the Kornfield Substantial Abuse Motion, the content of which can best be summarized with the following quote:

> "I contend that this is not a borderline case for substantial abuse determination. I consider this case to be an egregious example of bankruptcy abuse. If anyone outside the bankruptcy system knew of the Kornfields, knew of their income, knew of their lifestyle (Pittsford home, recent year and make of vehicles), knew that both their children attended the most prestigious and expensive private high school in the area, knew of their $390,000.00 exempt pension, and then knew that they did not have to give up one item of property, or pay one dime to any of their creditors and could obtain a Chapter 7 discharge of approximately $600,000.00 in debt (due, might I add, to the foreclosure of a $2.5 million home), that person would be outraged and I believe would have no faith whatsoever in the bankruptcy system.

> If the debtors changed their lifestyle and lived more modestly, they would be able to repay a substantial amount of their debt. Additionally, they would be able to repay a significant *amount* of money to their creditors."

## DISCUSSION

### I. *BANKRUPTCY—1997*

These matters have come before the Court for decision at a time when: (1) bankruptcy filings, particularly individual, consumer

Chapter 7 filings, are at an all-time high[3], but traditional economic indicators show the overall economy to be more stable and healthy than it has been for a long time; (2) fewer and fewer individual consumer debtors have been forced into bankruptcy because of a recent catastrophic event such as a significant job loss, business failure, matrimonial, disability, or uninsured health problem suffered by the debtor or a dependent; (3) more and more individual consumer debtors have filed bankruptcy because they could not handle the debt service on their outstanding consumer obligations as the balances increased because of continuing usage and the accumulation of unpaid interest; (4) it is not unusual for bankruptcy courts, such as this one, to see debtors who have unsecured consumer debt (not including mortgages and car loans) equal to their gross annual income, and, in many cases, equal to two or more times their gross annual income; (5) notwithstanding that many debtors have such substantial unsecured consumer debt, few seem to own (or report) any significant non-exempt tangible personal property[4], but many report substantial exempt retirement funds (IRA, 401–K or Keough accounts); (6) asked to explain how they believed that they could have ultimately repaid their substantial unsecured consumer debt, most debtors seldom have an appropriate answer; (7) fewer and fewer Chapter 13 debtors appear to have filed to pay back their creditors as much as possible, and more and more appear to have filed because it is the only way that they can pay the arrearages on their home mortgages, cram down personal property liens, such as on their vehicles, stretch out student loan repayments, or obtain a superdischarge[5]; (8) increased attorney advertising and the less-ening of the "stigma" of bankruptcy may be encouraging debtors to file rather than to explore and/or attempt other alternatives; (9) in some bankruptcy courts, such as this one, 25—30% of all adversary proceedings involve actions in Chapter 7 cases by credit card issuers to have their debt declared to be nondischargeable because of the debtor's fraud in the use of the credit card; (10) many more debtors appear to have used pre-approved credit cards not just to provide for necessities, but to live lifestyles well beyond their means and in some cases extravagant lifestyles; and (11) many more debtors who have lived for years beyond their means by the use of credit cards and other easy credit do not believe that they should be required to reduce their expenses and live a lifestyle below their current means for a period of time in order to repay any of the debt that enabled them to enjoy that prior lifestyle; (12) almost every debtor who files Chapter 7 has a friend, acquaintance, family member, fellow employee or neighbor who has filed a bankruptcy petition under the Bankruptcy Code; and (13) it is likely that the National Bankruptcy Commission will recommend that Congress clarify Section 707(b) by either amending it or eliminating it, depending on what other changes Congress may make to the Bankruptcy Code.

## II.  SECTION 707(b)

### A.  Statutory and Case Law

The decision of the United States District Court for the Central District of Illinois in *In re Ontiveros*, 198 B.R. 284 (C.D.Ill.1996) ("*Ontiveros*") and law review articles, such as those written by Robert V. Vandiver, Jr.[6]

3. In the Rochester Division of the Western District of New York, filings through the end of May are 78% higher than for the same period in 1994.

4. As set forth in their Schedules, the Carltons, even though they have had long-term stable employment, live in a relatively inexpensive area, and have had income of over $80,000.00 for a substantial number of years, have only $750.00 of tangible personal property and $250.00 of clothing, and the Kornfields, who have in the past had a substantial enough household income that they built a home which they anticipated would cost at least $1,000,000.00, have no furs or jewelry and only $4,000.00 of tangible person-

al property, which we are to believe is what they were going to use to furnish that $1,000,000.00 plus home.

5. This Court holds a confirmation hearing in each Chapter 13 case where it requires debtors to complete a questionnaire setting forth the various reasons for their Chapter 13 filing.

6. Robert B. Vandiver, Jr., Note, Bankruptcy *A Review of Recent Court Decisions Applying Section 707(b) of the Bankruptcy Code to Chapter 7 Proceedings*, 22 Mem.St.U. L.Rev. 549 (1992).

and Michael D. Bruckman [7], provide an excellent overview of the legislative history, statutory law and current state of the case law concerning Section 707(b).

In *Ontiveros*, the Court discusses the confusing and contradictory legislative history and summarizes what it believes are the three current approaches utilized by the Courts in making a decision on a Section 707(b) substantial abuse motion, as follows:

(1) A "Per Se Rule", utilized by the Eighth and Ninth Circuits, holds that a debtor's ability to pay his debts, standing alone, justifies a Section 707(b) dismissal, *see United States v. Harris*, 960 F.2d 74 (8th Cir.1992);

(2) A "Totality of the Circumstances Test", utilized by the Fourth Circuit, which has rejected the idea that solvency alone is a sufficient basis for finding substantial abuse. Circumstances considered include whether the debtor's petition was filed because of sudden illness, calamity, disability or unemployment, and whether the debtor's proposed family budget is excessive or unreasonable, *see In re Green*, 934 F.2d 568 (4th Cir.1991) ("*Green*"); and

(3) A "Hybrid Approach", utilized by the Sixth Circuit, which first analyzes the ability of the debtor to repay his creditors out of future earnings and then analyzes any mitigating factors which may then rebut the resulting presumption of substantial abuse. The factors considered include whether the debtor enjoys a stable source of future income, whether the debtor is eligible for adjustment of his debts under Chapter 13, whether there are state remedies with the potential to ease the debtor's financial predicament, and whether the debtor's expenses can be significantly reduced without depriving him of adequate food, clothing, shelter and other necessities, *see In re Krohn*, 886 F.2d 123 (6th Cir.1989) ("*Krohn*").

In the end, District Judge McDade employs an analysis which blends the approaches used by the courts in *In re Pilgrim*, 135 B.R. 314 (Bankr.C.D.Ill.1992), *In re Fitzgerald*, 155 B.R. 711 (Bankr.W.D.Texas 1993) ("*Fitzgerald*") and *In re Krohn*, 886 F.2d 123 (6th Cir.1989). I would summarize the test as follows: (1)first, the court considers the debtor's ability to pay as the primary, and possibly, in an appropriate case, the dispositive factor; (2) second, the court utilizes a totality of the circumstances test to determine whether any factors exist which may mitigate against the debtor's ability to pay or constitute aggravating factors to show his bad faith; and (3) third, the court considers whether the debtor is so dishonest or nonneedy as to warrant a dismissal under Section 707(b).

## B. *Commentators*

Given that: (1) Congress has failed to provide any definition of what constitutes a "substantial abuse"; (2) the legislative history is at times contradictory and clearly confusing; (3) the case law is in conflict, although most courts utilize some form of a totality of the circumstances approach; and (4) Congress has put its faith in individual Bankruptcy Judges to use their discretion to determine whether in an appropriate case there would be a "substantial abuse", it is helpful to review some of the statements made by commentators who have written about substantial abuse. These statements include the following:

(1) Dismissal is granted only where the debtor's abuse of the underlying policy of chapter 7 is "substantial." Implicit in the term, "substantial abuse" is the concept of a grossly unfair advantage that is obtained by the debtor as against his creditors as a result of filing a chapter 7 case. Lawrence Avery Young, *The Increasing Impact of Bankruptcy Code Section 707(b)*, 45 Bus.Law.2043, 2047–48 (1990);

(2) The authors believe that through section 707(b), Congress merely wanted to provide the court with a mechanism to dismiss cases that were shocking to its conscience. Wayne R. Wells, et al.,

---

7. Michael D. Bruckman, Note, *The Thickening Fog of "Substantial Abuse": Can 707(a) Help Clear the Air?*, 2 Am.Bankr.Inst. L.Rev. 193 (1994).

*The Implementation of Bankruptcy Code Section 707(b): The Law and the Reality,* 39 Clev.St.L.Rev. 15, 44 (1991);

(3) The strength of the "totality of the circumstances test" is that [sic] enables a bankruptcy court to make a case-by-case assessment to determine whether a debtor is attempting to abuse the chapter 7 discharge provisions .... the "totality of the circumstances test" seeks to effectuate the policies of debtor rehabilitation and creditor protection, which are fundamental to the bankruptcy process. Nonetheless, an honest debtor, who traditionally have [sic] been protected by the bankruptcy system, should not be compelled to forfeit his or her entitlement to a chapter 7 discharge. Carlos J. Cuevas, *Suggestions for the National Bankruptcy Review Commission and Congress: Amending Section 707(b),* 4 Am.Bankr. L.Rev. 507, 508 (1996);

(4) Rather, courts should review the particular circumstances of each individual debtor and apply the standard so as to prevent the abuse of the bankruptcy system by undeserving debtors, while at the same time recognizing the historical significance of the fresh start concept and the actual monetary recovery that ultimately will be realized by creditors. The substantial abuse standard should be applied in moderation with full awareness of the presumption favoring the relief sought by the debtor. Its application should be confined to use in those instances in which the actions of the debtor fall short of the "cause" standard of section 707(a) and the fraud standard of section 727, but still offend the sensibilities of the judge and leave him with the distinct impression that this particular debtor is seeking a "head start" as opposed to the desired "fresh start.". Robert M. Thompson, Comment, *Consumer Bankruptcy & Substantial Abuse and Section 707 of the Bankruptcy Code,* 55 Mo.L.Rev. 247, 264–65 (1990); and

(5) Dishonest and unneedy debtors create a distrust of, and skepticism for, the Bankruptcy Code. The greater the ability of someone filing under Chapter 7 to repay a substantial portion of debt out of future income, the greater the perception that the debtor is not truly needy. Therefore, substantial abuse should be viewed with the goal of separating the honestly needy from those who, because of a greater likelihood of future income, are not needy. Contrary to popular belief, discharge in bankruptcy is a privilege, not a right. Robert B. Vandiver, supra note 6, at 567.

## C. *The Court's Approach*

■ After reviewing the legislative history, statutory and case law and many of the commentaries, I believe that the blended approach utilized by the District Court in *In re Ontiveros* is legally sound and one which will also result in the Court, after an appropriate objection has been filed, properly applying the law and "basic principles of 'equity and judicial power and responsibilities' ", *see In re Stewart,* 201 B.R. 996, 1006 (Bankr. N.D.Okla.1996).

On a case-by-case basis, the Court will first determine whether the debtor has an "Ability to Pay". For this Court, this equates to the ability to pay: (1) all priority and unsecured debt in a Chapter 13 case under a plan of from one to five years in duration, or over a reasonable period of time in a Chapter 11 case, while properly providing for any secured debt; (2) all priority debt and a significant percentage of unsecured debt through such a Chapter 13 or 11 plan; or (3) a significant dollar amount, irrespective of percentage, to unsecured creditors through such a Chapter 13 or Chapter 11 plan. In making this determination, if necessary, the Court will scrutinize the record to determine whether the debtor's proposed family expense budget is excessive or extravagant, and whether the debtor's statement of income and expenses is representative of the Debtor's true financial condition [8], two of the

---

**8.** In some cases, this will require an evidentiary hearing. However, in other cases the debtor's

factors utilized by the Fourth Circuit in *Green.*

If after this analysis the Court determines that the debtor has an "Ability to Pay", it will then utilize a totality of the circumstances test to determine whether any factors exist which may mitigate against the debtor's "Ability to Pay", or constitute aggravating factors to show a debtor's bad faith or dishonesty, or that the debtor is truly not needy. The factors which the Court will consider are any and all relevant factors brought to its attention by the parties in a particular case, as well as the following non-exclusive list of factors, which the Court believes will likely be an expanding list if additional substantial abuse motions are brought before it for decision:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment (*Green*);

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay (*Green*);

(3) Whether the petition was filed in good faith (*Green*);

(4) Whether the debtor exhibited good faith and candor in filing his schedules and other documents (*Krohn*);

(5) Whether the debtor has engaged in "eve of bankruptcy purchases" (*Krohn*);

(6) Whether the debtor was forced into Chapter 7 by unforseen or catastrophic events (*Krohn*);

(7) Whether the debtor's disposable income permits the liquidation of his consumer debts with relative ease (*Krohn*);

(8) Whether the debtor enjoys a stable source of future income (*Krohn*);

(9) Whether the debtor is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code (*Krohn*);

(10) Whether there are state remedies with the potential to ease the debtor's financial predicament (*Krohn*);

(11) Whether there is relief obtainable through private negotiation, and to what degree (*Krohn*);

(12) Whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities (*Krohn*);

(13) Whether the debtor has significant retirement funds which could be voluntarily devoted in whole or in part to the payment of creditors (*In re Stratton*, 136 B.R. 804 (Bankr.C.D.Ill.1991);

(14) Whether the debtor is eligible for relief under Chapter 11 of the Bankruptcy Code (*Fitzgerald*); and

(15) Whether there is no other choice available to the debtor for working out his financial problems other than Chapter 7, and whether the debtor has explored or attempted other alternatives (*Fitzgerald*).

I believe that utilizing this approach will give due consideration to the presumption in favor of relief afforded to the debtor by Section 707(b), while at the same time ensuring that the Court separates the honest[9] and needy debtors seeking and traditionally deserving of a fresh start from the dishonest and/or unneedy debtors seeking a head start.

## III. *THE CARLTON SUBSTANTIAL ABUSE MOTION*

■ The Court finds that to grant the Carltons a discharge in a Chapter 7 case

---

schedules and the pleadings in the motion may be sufficient for the Court to make this determination. The level of scrutiny the Court will employ is significantly less than when it must determine "projected disposable income" in an actual Chapter 13 case under Section 1325(b)(1)(B).

9. For this Court, honesty not only implies honesty in pre-petition financial dealings, but honesty with respect to the Bankruptcy Code and the Bankruptcy System. In this regard, the Bankruptcy System provides an individual consumer debtor with a menu of alternatives (Chapter 7, Chapter 13 and Chapter 11) for obtaining any necessary financial relief. If a debtor refuses to consider Chapter 13 or Chapter 11, that may be legally permissible, but it does not mean that that debtor has been honest with the Bankruptcy Code and the Bankruptcy System, or that he has made every honest effort to treat his creditors with fundamental fairness and in good faith. A Chapter 7 discharge is a privilege not a right.

would be a substantial abuse of the provisions of Chapter 7, for the following reasons:

(1) the Carltons' unsecured debt is primarily,consumer debt;

(2) the Carltons have an Ability to Pay, in that:

(a) they are eligible for Chapter 13;

(b) without getting into each item of expense in the Carltons' proposed family budget, there are clearly a number of items which, given the expenses reported by similar families of four in the Chapter 13 cases the Court confirms, are excessive and possibly even extravagant. The food budget for a similar family of four is as much as $300.00 more than the Court often sees for similar families of four where both parents work and their two teenage children are attending school. With unpaid creditors, the Court questions the necessity of the $160.00 per month tuition expense, especially where other expense items do not appear to have been reduced to more appropriate levels. Given the long-term, stable employment and high income of this family over a number of years, the clothing expense is probably 50% higher than the Court often sees for similar families of four, especially where the teenage children are capable of earning money to pay for their own clothes. Also, the recreation expense is perhaps 50% higher than the Court often sees for similar families of four;

(c) the Carlton Amended Schedules show monthly living expenses of $358.00 more than the expenses on the Carlton Schedules filed with their petition, raising the question as to whether the Amended Statement of income and expenses is representative of the Carltons' true financial condition [10];

(d) it is not clear whether the $332.05 per month expense for 401–K and SIP contributions is mandatory or voluntary—if voluntary, in whole or in part—that could significantly increase the Carltons' Ability to Pay;

(e) if the expenses set forth above were reduced by the approximately $610.00 per month as suggested is possible, which would bring them within a range where it would clearly not deprive the Carltons of adequate food, clothing, shelter or other necessities ($21,960.00 over a 36–month Chapter 13 plan), that would result in an approximate 60% dividend to unsecured creditors exclusive of trustee's commissions;

(f) if the $332.00 per month in 401–K and SIP contributions are voluntary and, therefore, could be found to be additional projected disposable income and available to further fund a Chapter 13 plan, that would result in disposable income of $942.00 per month ($33,912.00 over a 36–month Chapter 13 plan), and allow an approximate 95% distribution to unsecured creditors exclusive of trustee's commissions;

(g) these potential $942.00 per month additional contributions to a Chapter 13 plan would be in addition to the $169.00 in monthly projected disposable income shown on the Carltons Amended Schedules, which must be assumed to be the most favorable analysis available to the Carltons. This amount itself would result in $6,112.80 being available over 36 months, or an approximate 17% distribution exclusive of trustee's commissions, a distribution which exceeds many of the Chapter 13 plans which the Court confirms, or $10,-188.00 over a 60–month maximum term, an approximate 28% distribution, more than an even greater number of Chapter 13 plans that the Court confirms; and

(h) notwithstanding the above analysis, it is clear that a couple such as the Carltons who have a combined an-

---

**10.** Given the mandate of Section 521, the Court has never understood why in response to substantial abuse motions most debtors amend their schedules of expenses upwards.

nual gross salary of in excess of $100,000.00, long-term, stable employment, and two healthy teenage children, could easily reduce their living expenses to a level which would enable them to have an Ability to Pay all, a significant percentage, or a significant amount of money to their creditors in a Chapter 13 plan [11].

(3) the Carltons' petition was not filed because of a recent catastrophic event. Although the Carltons have asserted that a sudden and unexpected death in Mrs. Carlton's family resulted in some additional expenses for them, that was in 1990. It was really their substantial consumer debt level that resulted in their filing and that is not a traditional catastrophic event;

(4) the Carltons have and will continue to enjoy stable employment and a significantly higher than average family income;

(5) Mr. Carlton's assertion that at 45 years old he can no longer work the overtime that he previously did to maintain a higher level of income, raises a concern as to the Carltons' honesty and good faith;

(6) Mr. Carlton has in excess of $10,000.00 in retirement funds, all or part of which might be able to be utilized now or in the future, to pay creditors or supplement family income;

(7) even without a bankruptcy filing, it seems possible to the Court that the Carltons could simply: (a) allow any active creditors to garnish their respective wages, which in New York would not likely exceed 10% of their annual gross income; (b) reduce their expenses; and (c) live on the remaining 90% of their gross income which would not deprive any of them of adequate food, clothing, shelter or other necessities; and

(8) the Carltons appear unwilling to make any effort to reduce their excessive living expenses to enable them to pay something to their creditors.

In summary: (1) the Carltons clearly have an Ability to Pay; (2) the Court finds no factors under a totality of the circumstances test which mitigate against the Carltons' Ability to Pay; (3) the Carltons are not being honest with the Bankruptcy System because there are other bankruptcy and non-bankruptcy alternatives which would offer them adequate financial relief, but would require some minimal sacrifices which the Carltons are capable of, but unwilling to make; (4) the Carltons may be experiencing financial difficulties brought on by their use of consumer credit that they could not handle, but they are not traditional debtors in need of Chapter 7; and (5) to allow the Carltons a Chapter 7 discharge would be a substantial abuse of Chapter 7.

## IV. THE KORNFIELD SUBSTANTIAL ABUSE MOTION

The Court finds that to grant the Kornfields a discharge in a Chapter 7 case would be a substantial abuse of the provisions of Chapter 7, for the following reasons:

(1) the Kornfields' unsecured debt is primarily consumer debt [12];

(2) the Kornfields have an "Ability to Pay", in that:

(a) without a final determination of the First Federal and First Union unpaid mortgage deficiency claims, at this time it appears that amount of the Kornfields' unsecured debt in excess of $250,000.00. Therefore, unless these claims were voluntarily reduced by the creditors to enable them to proceed in Chapter 13, the Kornfields would be ineligible under Section 109(e) to be debtors under

---

**11.** Even allowing for the higher than normal mortgage expense that the Carltons pay, this Court sees many similar families in Chapter 13 living on half this gross income and still funding a plan.

**12.** Section 101(8) defines "consumer debt" as debt incurred by an individual primarily for a personal, family, or household purpose, and numerous courts have found mortgages to be consumer debts. *See In re Goodson*, 130 B.R. 897 (Bankr.N.D.Okla.1991).

Chapter 13. However, the Kornfields are eligible for Chapter 11. Although under Section 541(a)(6), Dr. Kornfield's income may be personal service income and thus not property of the estate, as asserted by the Kornfields, as previously set forth in this Decision & Order, the Bankruptcy Code offers a menu of alternatives to provide a financially troubled individual with appropriate financial relief. Nothing would prevent Dr. Kornfield from filing a Chapter 11 case and devoting so much of his post-petition personal service income as would be necessary to fund a plan that would be in good faith and fundamentally fair to the Kornfields' creditors. In that regard, the Court would do everything possible to make sure that the proceeding was completed as inexpensively and quickly as possible. The fact that Dr. Kornfield insists that he cannot be made to do so, and does not want to do so, to this Court shows a lack of honesty as to the Bankruptcy System, and clearly constitutes an aggravating factor as to the neediness and good faith of the Kornfields;

(b) again, without getting into each item of expense in the Kornfields' proposed family budget, there are clearly a number of items which, given the expenses reported in other Chapter 13 cases by similar families of six, with one or more children attending college, are excessive and possibly even extravagant. The food budget is at least $350.00 more than the Court often sees for similar families, and that is where both parents work. In addition, the Court does not find credible the assertion that Dr. Kornfield, who is in his 50's and clearly has an established medical practice, actually needs to expend monies to entertain potential referring physicians. With such substantial unpaid creditors, the Court seriously questions the necessity of the $4,470.00 per month ($53,640.00 an-

nualized) tuition expense, especially where other expense items do not appear to have been reduced to more appropriate levels. The Kornfields currently reside in Pittsford, New York which has a nationally acclaimed public school system that can provide the Kornfields' children with an excellent education and can also satisfactorily address the special needs of two of the children. As to the now and soon-to-be college age Kornfield children, perhaps the suggestion of Bankruptcy Judge Nancy C. Dreher is appropriate—"perhaps the son, like other children of parents of modest or even not so modest means, could find some way to fund a college education, other than at the expense of his father's creditors. *In re Gyurci,* 95 B.R. 639, 643 (Bankr.D.Minn.1989). Given the long-term, stable employment and high income of this family over a number of years, notwithstanding that it may be declining to what is still an extremely high gross annual income, the monthly clothing expense is probably $200.00 higher than necessary, especially where the teenage and older children are capable of earning money to pay for their own clothes. In addition, the telephone expense is at least $50.00 higher per month than would be reasonable. Given the substantial debt that the Kornfields have, it is doubtful that they need to make a $200.00 per month charitable donation. This is not to say that it is otherwise unreasonable, if all of the Kornfields' creditors were paid. The Kornfields' 1996 gross monthly income was $25,939.16. Applying an income tax withholding factor, which may be high, of 50.8%, the same percentage utilized in the Kornfield Schedules, results in a monthly net income of $13,177.00. Reducing the monthly expenses for the items discussed above to a reasonable level, which would not deprive the Kornfields of adequate food, clothing, shelter or

other necessities, without even addressing the $3,000.00 per month being spent to rent a home, and adding the $1,100.00 profit sharing loan amount, results in monthly disposable income of $4,117.00 ($13,115.00 in expenses shown on the Schedules, plus $1,100.00 = $14,215.00, less reductions of $350.00 for food, $4,470.00 for tuition, $50.00 for phone, $200.00 for charitable contributions = $5,270.00 = net monthly expenses of $8,645.00. $12,762.00 net monthly income less $8,645.00 net monthly expenses = $4,117.00). This alone would make available for payments to creditors $148,212.00 over a 36–month term, or $247,020.00 over a 60–month term. This is a very substantial amount of money which could be repaid to the Kornfields' creditors without, as set forth above, depriving any of them of adequate food, clothing, shelter or other necessities; and

(c) notwithstanding the above analysis, it is clear that a couple, such as the Kornfields, who have a gross annual salary of in excess of $300,000.00, long-term, stable employment, although the health care field may be changing, could easily reduce their living expenses to a level which would enable them to have an ability to pay a significant amount of money to their creditors under a Chapter 11 plan, or under a Chapter 13 plan if First Federal and First Union were to work with the Kornfields, the Court and the Chapter 13 Trustee to reduce their claims to bring the Kornfields within the debt limits of Section 109(e).

(3) the Kornfields' petition was not filed because of a recent catastrophic event. The financial fall-out and deficiency amounts due in connection with their building an extravagant home, can hardly be considered a traditional catastrophic event. Clearly the Kornfields have some financial problems because of declining income and an unwillingness to reduce expenses accordingly, but they are primarily because of the fall-out from their extravagance;

(4) Dr. Kornfield has and will continue to enjoy stable employment, and the Kornfields will have a significantly higher than average family income;

(5) the Kornfields' unwillingness to consider a Chapter 11 case where they might negotiate a consensual plan with their creditors, in fact to suggest that all that could or would result from a Chapter 11 case would be a no asset liquidation plan, raises concerns as to their honesty and good faith in their approach to the Bankruptcy System and their creditors;

(6) Dr. Kornfield has in excess of $390,-000.00 in retirement funds all or part of which might be able to be utilized, now or in the future, to pay creditors or supplement family income;

(7) even without a bankruptcy filing, it seems possible to the Court that the Kornfields, who report no non-exempt assets whatsoever, could simply: (a) allow any active creditors to garnish Dr. Kornfield's wages, which in New York might not exceed 10% of his annual gross income, unless the creditor were to receive an installment payment order from a New York State Supreme Court Judge, which would indicate that the Judge believed that Dr. Kornfield could afford to pay more than 10% of his gross annual income; (b) reduce their family expenses; and (c) live on the remaining 90% of his gross income without depriving any of them of adequate food, clothing, shelter or other necessities; and

(8) The Kornfields appear unwilling to make any effort to reduce their possibly actual, but in large part voluntary and excessive, living expenses to enable them to pay something to their creditors. In fact, the Kornfields, like the Carltons, have in essence argued to the Court that no one should involuntarily be required to live below their current means in order to repay creditors, notwithstanding prior financial mistakes, and the Bankruptcy System is there to ensure that that cannot happen, because it allows a debtor to

simply file a Chapter 7 case, obtain a discharge from all of his debts, even though he has an Ability to Pay, continue to live an extravagant lifestyle, and retain substantial exempt funds. I don't happen to agree.

In summary: (1) the Kornfields clearly have an Ability to Pay; (2) the Court finds no factors under a totality of circumstances test which mitigate against the Kornfields' Ability to Pay; (3) the Kornfields are not being honest with the Bankruptcy System, because there are other bankruptcy and non-bankruptcy alternatives which would offer them adequate financial relief, but would require some lifestyle sacrifices which the Kornfields are capable of, but unwilling to make; (4) the Kornfields may be experiencing financial difficulties brought on by their own extravagance in building a multi-million dollar home, but they are not traditional debtors in need of Chapter 7; and (5) to allow the Kornfields a Chapter 7 discharge would be a substantial abuse of Chapter 7, no matter what legal standard the Court utilizes.

## V. OVERVIEW

On the facts and circumstances before the Court, to allow the Carltons and the Kornfields to obtain the Chapter 7 discharges they are seeking without making any good faith attempt to repay at least a portion of the amounts that they owe to their creditors would clearly be a substantial abuse, because: (1) it would have allowed them to have taken a grossly unfair advantage over their creditors; (2) at least to this Court's conscience, it would be shocking; (3) it would clearly be affording them a "head start", as opposed to a traditional "fresh start"; and (4) it would be affording clearly non-needy individuals relief traditionally reserved for honest but needy debtors.

## CONCLUSION

The Carlton and Kornfield Substantial Abuse Motions are in all respects granted.

**IT IS SO ORDERED.**