**In re Gary P. MANSKE and Anita G. Manske, Debtors.**

**No. 03–357—JES.**

United States Bankruptcy Court, E.D. Wisconsin.

Sept. 28, 2004.

James F. Kracmer, Kenosha, WI, for Debtors.

Michael F. Dubis, Waterford, WI, trustee.

Amy J. Kinsberg, Office of U.S. Trustee, Milwaukee, WI, U.S. Trustee.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

### *PRELIMINARY STATEMENT*

This dispute involves the United States Trustee's motion to dismiss this case on the grounds of substantial abuse pursuant to 11 U.S.C. § 707(b).[1] A trial was held on May 26, 2004 and adjourned to September 15, 2004. Testimony was received from the debtors (hereafter referred to as "Anita" and "Gary" or "debtors"). Exhibits were received into evidence. At the close of testimony, oral arguments were presented.

This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

### *FACTS*

Anita and Gary formerly lived in Trevor, Wisconsin, which is located near the border of Wisconsin and Illinois. They both held very well paying jobs at Nielsen Massey, a nearby plant in Illinois which makes vanilla extract. Gary was its plant manager and worked at this plant for 26 or 27 years. When he terminated his employment, he was earning approximately $50,000 to $55,000 annually. Anita also was employed at Nielsen Massey where

---

1. 11 U.S.C. § 707(b) states, in part:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

she worked for 19 years, the last 10 years as its office manager. When she quit working, she was earning approximately $45,000 annually. Anita and Gary's combined annual gross income was, therefore, in the range of $95,000. When they terminated their employment, their combined retirement benefits totaled approximately $350,000.

Anita and Gary have been married for 20 years and do not have any dependents. Gary is 52 years old, and Anita is 48 years old. Anita is a high school graduate who also attended but did not graduate from Roane State Community College located in Tennessee. Gary has attained a "GED," which is the equivalent of a high school diploma.

On September 11, 2003, Anita visited her 78 year old mother, Mary Gunter, at her residence in Harriman, Tennessee. Mrs. Gunter was convalescing from left hip replacement surgery. Anita testified that her mother's surgery did not go very well. When Mrs. Gunter's left hip is healed, Anita further testified that the plans are to have her right hip replaced.

On September 19, 2003, Anita returned to Wisconsin at which time she and Gary decided to quit their jobs and move to Tennessee. According to Anita, this decision was made in order to take care of Mrs. Gunter, who was in need of full-time care.

Sometime after September 19, 2003 and before October 1, 2003, Anita and Gary quit their jobs.

In early October, 2003, Gary and Anita contacted Attorney James Kracmer to discuss bankruptcy.

On October 20, 2003, the debtors filed a joint petition in bankruptcy under Chapter 7. In their Statement of Intention, the debtors declared that they intended to surrender their home in Trevor, Wisconsin, to Washington Mutual Bank and Flagstar Bank, the holders of the first and second mortgages, respectively. Washington Mutual Bank subsequently filed its motion for relief from stay, which was unopposed by the debtors, and which resulted in this court granting relief from the automatic stay to Washington Mutual Bank.

On November 11, 2003, Gary and Anita moved to Harriman, Tennessee.

On December 4, 2003, the debtors entered into a reaffirmation agreement with U.S. Bank for the lease of a 2002 Chevrolet Trail Blazer requiring monthly payments of $627.68 and which vehicle is being driven by Anita.

On January 8, 2004, the debtors also redeemed a 2002 Hyundai automobile for a total cash redemption price of $9,515.[2]

Over the span of several years, the debtors accumulated a substantial amount of credit card debts. Their total unsecured debts as listed in their bankruptcy schedules is approximately $123,000, a large portion of which are credit card obligations. Precisely how much of these obligations are attributable to credit cards is unclear. However, it appears that at least $73,000 of these unsecured debts, or approximately 60%, are credit card debts. Some of the debtors' obligations were satisfied by debt consolidation and refinancing which only served to cause the debtors to worsen their financial condition.

Anita testified that she presently works as a call center operator at America's Collectable Network in Knoxville, Tennessee, which is approximately 25 miles from Har-

---

**2.** This vehicle was subsequently sold to Anita's sister who lives in Tennessee and replaced by a 2001 Mazda automobile which the debtors purchased for cash and which is being driven by Gary.

riman, Tennessee. She receives approximately $322 per week take-home pay. At the time of the May 26, 2004 hearing, Gary was unemployed and had been unemployed since moving to Tennessee. Shortly after the May 26, 2004 hearing, he also obtained employment at America's Collectable Network. His weekly take-home pay is approximately $275 (after a deduction for an estimated sum for medical, dental, life, and disability insurance which will be provided by his employer). As of the May 26, 2004 hearing, the parties had withdrawn somewhere between $7,000 and $14,000 of their combined retirement benefits in order to meet their on-going expenses.[3]

Anita testified that she has medical problems which require medical treatment. She is diabetic, has high blood pressure, asthma, and a hiatal hernia for which she receives medical treatment. Nothing in the testimony revealed any medical problems for Gary.

### ANALYSIS

In order to prevail under § 707(b), the trustee must first establish that the debtors' debts are "primarily consumer debts." There has been no challenge by the debtors to this requirement, and based upon the evidence presented, the court is satisfied that this element has been proven.

The issue in this case is whether the trustee has proven the second requirement—namely, that granting a discharge to the debtors under Chapter 7 would constitute "substantial abuse."

 Congress has not defined what is substantial abuse for purposes of § 707(b). The court must look to the totality of the circumstances based upon the particular facts of each case. See In re Herbst, 95

B.R. 98, 101 (W.D.Wis.1988). There are many different factors which must be considered. "[T]he principal factor is the ability of the debtor to repay debts for which discharge is sought." Herbst, 95 B.R. at 101. "Ability to pay," for purposes of § 707(b), means the ability of debtors to fund a Chapter 13 plan from their disposable income. This factor, along with other relevant factors, will be considered in the light of the particular facts of this case. The decision on whether to dismiss a case under § 707(b) is discretionary with the court. In re Behlke, 358 F.3d 429 (6th Cir.2004).

Presently, the debtors' combined current wages are not sufficient to enable them to meet their current living expenses without depending upon their retirement savings to meet these expenses. Their current monthly expenses as reflected on Schedule "J" of their bankruptcy schedules total approximately $3,311, and their combined monthly take-home pay totals approximately $2,600. Some of these expenses can be either eliminated or reduced. Their combined transportation costs can be adjusted downward from $472 per month to $350 per month. In addition, their monthly health insurance costs of $389.51 can be entirely eliminated because their health insurance is now covered under their employment, and their contributions have been deducted from their gross pay. But even with this adjustment in expenses, their income from wages and their expenses are a "wash."

 However, a lack of ability by debtors to fund a Chapter 13 plan does not necessarily defeat a § 707(b) dismissal motion where there are other compelling factors which justify such dismissal. See In re Krohn, 886 F.2d 123, 127 (6th Cir.1989);

---

**3.** The testimony in this regard was unclear. One portion of Anita's testimony indicated the total amount withdrawn from the debtors' combined retirement benefits was approximately $14,000, and another portion of the testimony indicated this amount was $7,000.

*In re Uddin,* 196 B.R. 19, 25 (Bankr. S.D.N.Y.1996); *In re Wright,* 276 B.R. 399, 404 (Bankr.W.D.Pa.2002); *In re Stewart,* 175 F.3d 796, 809 (10th Cir.1999).

■ To be sure, there are some factors in this case which, together with the debtors' current inability to pay, favor awarding them a Chapter 7 discharge. There were no eve of bankruptcy purchases by Anita and Gary and they are currently living a frugal lifestyle. The testimony presented also discloses that, in October of 2001, the debtors obtained a $73,000 cash loan through a second mortgage on their home, which proceeds were used in a substantial part to pay off some of their credit card bills. In addition to this loan, Anita testified that the debtors received a personal loan for $25,000 in June or July of 2002 to pay off certain of their credit card bills. Notwithstanding these payments, this left the debtors with unsecured debts exceeding $123,000.

On the other hand, there are also factors which support the U.S. Trustee's motion to dismiss under § 707(b), notwithstanding the debtors present inability to pay. The debtors incurred huge credit card debts over a period of several years, a substantial portion of which were used to buy luxury items. These purchases included: a 42″ television set purchased in January of 2002, a motorcycle purchased in September of 2002, and a 50″ television set purchased in February of 2003. For a considerable period of time, the debtors were living beyond their means. This tips the scales in favor of dismissal pursuant to § 707(b). *In re Norris,* 225 B.R. 329, 333 (Bankr.E.D.Va.1998).

The biggest sticking point in this case involves the circumstances under which these debtors voluntarily decided to leave their high-paying jobs in Wisconsin and move to Tennessee. They were not forced to do so. They were not terminated by their employer, nor were they required to stop working because of a sudden illness, calamity, or disability on the part of either of them. Instead, the debtors testified they quit their jobs and moved to Tennessee ostensibly for the sole purpose of assisting Anita's mother.

The debtors' self-imposed termination of employment, sudden move to Tennessee, and the timing of a series of events starting in September of 2003 and continuing over a short period of time are extremely suspect. The court does not accept the debtors' explanation that the sole purpose of their actions was to take care of Mrs. Gunter. The debtors had other more viable options available to them to provide assistance to Mrs. Gunter—none of which were utilized. They could have remained in Wisconsin and kept their jobs while at the same time providing financial assistance for nursing care for Mrs. Gunter. Anita's response as to why this was not done was that it was not "feasible" to do so. The court finds that Anita's answer has a hollow ring to it. Anita could have gone to Tennessee alone on a temporary basis to help her mother, with Gary remaining in Wisconsin and keeping his job until Mrs. Gunter's long-term prognosis became clearer. However, that option was not followed. When Anita was asked how long her mother's physical condition would last, her answer was "indefinite." Moreover, there is nothing in the record to show that Gary and Anita could not have obtained leaves of absence from Nielsen Massey instead of abruptly quitting their jobs.

■ The court in *In re Tielsch,* 299 B.R. 114 (Bankr.W.D.Pa.2003), was faced with interpreting the meaning of "ability to pay" for purposes of 11 U.S.C. § 523(a)(15). It concluded that it is not limited to considering only such income as the debtor was then currently producing

but may also consider such income as the debtor was capable of producing in the future. By the same token, the facts and circumstances of the instant case justify taking into account the debtors' future earning capabilities in addressing the meaning of "ability to pay" for § 707(b) purposes.

Mrs. Gunter also had her own financial resources available to help with her ongoing medical expenses and needed assistance. She owns and lives on an unencumbered farm containing 49 acres in Harriman, which could have either been mortgaged or sold in order to supplement payment for her medical expenses not covered by Medicare. She chose not to do so because, according to Anita, she is "stubborn," adding that her mother "was born and raised on the farm where she lives" and that she was not going to sell her home or be removed from it.

Gary and Anita's failure to pursue any of these options instead of suddenly moving lock, stock and barrel to Tennessee without any firm commitments for employment leaves this court with the firm conviction that the debtors' stated intention was solely to assist Mrs. Gunter is not believable. As noted in *In re Carlton,* 211 B.R. 468, 482 (Bankr.W.D.N.Y.1997) (aff'd 214 B.R. 705, 711 (W.D.N.Y.1997)), the debtors unwillingness to consider reasonable alternatives raises concerns as to their honesty and good faith in their approach to the bankruptcy system and their creditors. In *In re Helmick,* 117 B.R. 187 (Bankr. W.D.Pa.1990), the debtor-wife voluntarily quit her part-time job and the debtor-husband changed his job to a lower-paying position on the eve of filing for bankruptcy. Their unsecured debts, much like in the

case at bar, consisted of credit card obligations. The bankruptcy court in *Helmick* dismissed the case under § 707(b) finding that the actions taken by these debtors were a calculated move to lower the family's income just prior to filing for bankruptcy in order to purposely affect their ability to fund a chapter 13 plan.

Also, the actions taken by the debtors in entering into a reaffirmation for a lease of a 2002 Chevrolet Trail Blazer lead this court to question their true motivation. The debtors declared in their reaffirmation agreement that they understood this agreement was not required under the law and that it was a completely voluntary act on their part. Their attorney stated, in his declaration, that this reaffirmation agreement did not impose an undue hardship upon them. The debtors entered into this reaffirmation agreement in December, 2004, after they had quit their employment at Nielsen Massey and before either debtor obtained any new employment. Anita did not start her present job in Tennessee until March 8, 2004. This lease, which was reaffirmed, required hefty monthly payments of $627.68. It also contained within it a draconian termination provision in the event the debtors chose to cancel this lease.[4] Nothing in the testimony demonstrated any need for Anita to lease such an expensive 4–wheel drive vehicle. The debtors' unwillingness to lease a more economical vehicle at substantially lower monthly lease payments (which savings in turn could have freed funds for use in a chapter 13 plan) is further evidence of the debtors' bad faith. *In re Carlton,* 211 B.R. at 482.

Anita and Gary knew, by taking the course of action which they did, that they

---

4. The lease agreement provided in part the following: "Early termination. You may have to pay a substantial charge if you end this lease early. The charge may be *up to several thousand dollars.* The actual charge will depend on when the lease is terminated. The earlier you end the lease the greater this charge is likely to be."

would knowingly be taking an unfair advantage of their creditors. Had they remained in Wisconsin and kept their jobs, they easily would have had the ability not only to provide financial assistance to Mrs. Gunter but also to fund a chapter 13 plan and provide their creditors with a substantial dividend.

In *In re Cox*, 249 B.R. 29, 32 (Bankr. N.D.Fla.2000), the court declared:

> Although it is admirable that the Debtor would want to take care of his mother, she is not a dependent. "[T]he moral obligation to a family member who is not a dependent does not take priority over the legal obligation to repay a creditor." *[In re] Haddad*, 246 B.R. [27] at 37 [(Bankr.S.D.N.Y.2000)].

By their actions, the debtors in the case at bar have placed their personal desires ahead of and to the detriment of their creditors.

▆ In her testimony, Anita stated: "I never had any plans of defrauding anyone that I owed. I had plans on paying." Because of the actions taken by the debtors, the court is not persuaded by Anita's testimony in this regard. Debtors, if ever, will rarely declare that it was their purpose to defraud their creditors. That intent may be proven by circumstantial evidence or inferences drawn from the debtors' course of conduct. *In re Costello*, 299 B.R. 882, 895 (Bankr.N.D.Ill.2003).

Other portions of the testimony presented by the debtors also lead to the conclusion that they were seeking an unfair advantage over their creditors. When Anita was asked why Mrs. Gunter could not come to Wisconsin, she replied: "That's not feasible. My mother is not going to be uprooted." Gary was not forthright in his testimony. At the May 26, 2004 hearing, in responding to why he had been unable to obtain employment in more than six months while in Tennessee, he replied that he was trying to avoid working outside of Harriman. As noted in this decision, he has since had a change of heart and is currently employed along with Anita at America's Collectable Network.

## CONCLUSION

This court has taken into consideration the statutory presumption set forth in 11 U.S.C. § 707(b) in favor of granting the relief requested by the debtors. However, after balancing all of the factors in this case and reviewing the totality of the circumstances, this court concludes that this presumption has been overcome and that the granting of Chapter 7 relief to these debtors would constitute substantial abuse within the meaning of 11 U.S.C. § 707(b). There is no constitutional right to obtain a discharge in bankruptcy. A discharge is a privilege, not a right. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir.1996).

The U.S. Trustee's motion to dismiss pursuant to 11 U.S.C. § 707(b) is **GRANTED.**

This decision shall stand as and for the court's findings of fact and conclusion of law in accordance with Bankruptcy Rule 7052 of the Federal Rules of Bankruptcy Procedure.